## UNITED STATES *v.* SHIPP.

### INFORMATION IN CONTEMPT.

No. 5, Original. Argued March 2, 3, 1909.—Decided May 24, 1909.

The court, having already held, 203 U. S. 563, that the information sufficiently set forth a contempt of the court to punish which the court has jurisdiction, now finds on the testimony taken under its direction that certain of the defendants named were guilty of the contempt as charged and directs that attachments issue against them, and that the defendants not found guilty be discharged.

Where a riot and the lawless acts of those engaged therein are the direct result of opposition to the administration of the law by this

court, those who defy its mandate and participate in, or who knowingly fail to take the proper means within their official power and duty to prevent, acts of violence having for their object to, and which do, defeat the action of this court are guilty of, and must be punished for, contempt.

One, who after conviction by the state court has applied to the Federal court for his release on *habeas corpus* on the ground that he was denied due process of law is remanded by the Federal court to the custody of the sheriff to be detained for a specified time in which to enable him to prosecute an appeal to this court, is held under § 766, Rev. Stat., as a Federal prisoner and the sheriff is accountable to the Federal courts; and, to the extent of his power and the means under his control, he must exercise due diligence and reasonable efforts to protect the prisoner from mob violence, and if, after this court has granted an appeal, he negligently fails in his duty in this behalf, he is guilty of contempt.

Knowledge of an allowance by this court of an appeal and a stay of proceedings renders those who defy the mandate of the court and so conduct themselves as willfully to defeat the administration of the law liable for contempt.

This court having allowed an appeal from an order of a Circuit Court discharging a writ of *habeas corpus* and remanding the prisoner to the custody of the sheriff to be held for a specified period for prosecution of the appeal, the sheriff and his deputies and the jailer, who had knowledge of such allowance of appeal and also of an intense feeling in the neighborhood against the prisoner which on previous occasions had threatened his safety, were bound to use all means within their power to protect him, and failure on their part to take any precautions whatever to prevent the seizure and killing of the prisoner at the hand of a mob attacking the jail while in a defenseless condition was, under the circumstances of this case, willful negligence, and disregard of duty to, and contempt of, this court; and so held as to the sheriff of Hamilton County, Tennessee, and his deputy and the jailer, in connection with the lynching on March, 19, 1906, of Ed Johnson by a mob after this court had allowed his appeal from an order refusing relief on *habeas corpus*.

Those of a mob who attack a state jail and lynch a person held therein as a Federal prisoner under an order of this court of which they have had notice are guilty of contempt of this court.

THE facts, which involve the lynching of a person held in the custody of a sheriff under an order of the Federal court

and after an appeal had been allowed by this court from an order of the United States Circuit Court denying his petition for *habeas corpus,* are stated in the opinion.

*Mr. Attorney General Bonaparte,* and *Mr. Solicitor-General Hoyt,* with whom *Mr. Edwin W. Lawrence,* Special Assistant to the Attorney General, was on the brief for the United States:

This is an information in contempt filed by the Attorney General of the United States charging the defendants with contempt of this court in lynching the negro Ed Johnson at Chattanooga on March 19, 1906, on the ground that he was at that time a prisoner in the jail under order of this court and that the lynching was in direct defiance of the known order of this court and to prevent the administration of the law by it.

The information appears at length, pages 439-444, *post.*

Certain preliminary questions of law were raised by defendants and passed upon by this court, 203 U. S. 563. It was there held that the complaint sufficiently set forth a contempt of this court; that it was immaterial for the purposes of this proceeding whether or not the Circuit Court had jurisdiction of the *habeas corpus* proceedings or whether this court had jurisdiction to entertain the appeal; and that the answers of the defendants under oath disavowing intent did not purge them. This decision removes from the case all questions of law except those as to the admission of evidence. The question now before the court is one of fact: Has the United States in the evidence, which has been taken by the commissioner under order of this court, proved the allegations of the information? Most of those allegations are established by agreement[1] or undisputed evidence. The only issues are: (1) Were the sheriff and his deputies informed and did they have every reason to believe that an attempt would be made

---

[1] This agreement appears at length at page 472, *post.*

in the evening of March 19, by a mob to break into, and take
Johnson from, the jail for the purpose of lynching him?    (2)
Did the sheriff and his deputies commit acts and do things
manifesting a purpose and disposition on their part to render
it less difficult and less dangerous for the mob to lynch John-
son and aid and abet the mob?   (3) Were defendants, except-
ing Shipp and Gibson, members of the mob which lynched
Johnson, or did they participate in the conspiracy?   (4) Did
defendants in the things they did intend to show contempt
of the order of this court and to prevent it from hearing John-
son's appeal? [1]

The information alleges that the acts of the defendants were
done with intent to show their contempt and utter disregard
for the order of this court, and in order to prevent this court
from hearing the appeal of Johnson then under condemnation
of death and who had been remanded by the Circuit Court to
the custody of the sheriff pending the action of this court
which had granted the appeal.   In delivering the opinion upon
the hearing of the preliminary questions of law, 203 U. S. 563,
Mr. Justice Holmes said:

"If the presence and acts should be proven, there would be
little room for the disavowal of intent. . . . It may be
found that what created the mob and led to the crime was the
unwillingness of its members to submit to the delay required
for the appeal.   From that to the intent to prevent that delay
and the hearing of the appeal is a short step."

Intent is best proved, and in many cases can only be proved,
by acts.   If the acts with which defendants are charged have
been proven, it needs no argument to demonstrate that de-
fendants intended to prevent this court hearing Johnson's
appeal and to delay its mandate.   It has already been shown
that the reason for the mob's action was fear of the law's de-
lay and the unwillingness of the sheriff, his deputies, and the
members of the mob to submit to it.   The intent to commit

---

[1] The Government's brief then reviews the testimony at length.

a contempt of this court was necessarily present in the acts of the defendants.

This proceeding is unique in the history of courts.

Its importance cannot be overestimated. Lynchings have occurred in defiance of state laws and state courts without attempt, or at most with only desultory attempt, to punish the lynchers. Perpetrators of such crimes have heretofore been censured only by public opinion; courts have remained silent. Powerful as such opinion always is, severe as it has been in its rebuke of such deeds, it has been inadequate to check these outbreaks of lawlessness. Only recently lynchings became so numerous that the whole country was aroused to earnest discussion of mob violence and a remedy for it. It is indeed useless to seek relief unless the judiciary can punish those who snatch and kill the men it has imprisoned. The arm of justice fetters men for years. It strikes death to the murderer. It can take property and life. Must it confess it is too weak to protect those whom it has confined? The arm can destroy. Can it not protect? If the life of one whom the law has taken into its custody is at the mercy of a mob the administration of justice becomes a mockery.

When this court granted a stay of execution upon application of Johnson, it became its duty to protect him until his case should be disposed of. It matters not with what crime he was charged. It is immaterial what the evidence was at the trial. Sentenced to death, Johnson came into this court alleging that his constitutional rights had been invaded in the trial of his case, and upon this the Supreme Court said he had a right to be, and would be, heard. From that moment until his case should be decided, he was under the protection of this court. And when its mandate, issued for his protection, is defied, punishment of those guilty of such contempt must be certain and severe.

Never in its history has an order of this court been disobeyed with impunity. A few attempts to disregard its decrees have been made, but always without ultimate avail. In 1779 the

Continental Congress, through its Standing Committee of Appeals in Cases of Capture, reversed the judgment of the Court of Admiralty of the State of Pennsylvania and made an award in favor of Olmstead, a claimant, in a prize case. The State resisted enforcement of the decree and Congress yielded. Olmstead thus found the decision of the appellate tribunal in his favor useless to him. With the adoption of the Constitution the jurisdiction of appeals formerly exercised by the Continental Congress became vested in this court and in 1808 Olmstead sought redress here in the same matter. *United States* v. *Peters,* 5 Cranch, 115. In one of his powerful opinions the great Chief Justice made it clear that the court's decrees in favor of Olmstead must be obeyed. Nevertheless the State for a time defied the order. This resistance, however, was unable to withstand the unswerving determination of this court and finally disappeared. Members and officers of the state militia who had interfered with execution of the decrees were tried and sentenced to fine and imprisonment. This court then declared and established a supremacy which has ever since been maintained and which will always be a priceless heritage to the American people.

In the controversy between the State of Georgia and the Cherokee Indians, which came before this court in *Worcester* v. *Georgia,* 6 Pet. 515, the State refused to release a prisoner in obedience to a direction of this court. Although the National Executive declined to aid in requiring obedience, after some months the State withdrew opposition and again the supremacy of this court was recognized.

In the history of the case of *Ableman* v. *Booth,* 21 Howard, 506, we for a third time find evidence of a State arraying itself against this court. Officers and courts of the State of Wisconsin, contrary to the decision of this court, insisted that the fugitive-slave law was unconstitutional, and resisted its enforcement. But the outcome was the same. Finality of decisions of the Supreme Court of the United States was declared, and obedience to its order was compelled.

It is not surprising that in the early history of this country, when the jurisdictions of the Federal and the state governments were not clearly defined or well understood, States should have resisted the orders of this court. But it is remarkable that individuals should now undertake to defy the mandate of this great tribunal.

Justice is at an end when orders of the highest and most powerful court in the land are set at naught. Obedience to its mandates is essential to our institutions. Contempts such as this strike down the supremacy of law and order and undermine the foundations of our Government. Recurrence of such acts must be prevented. The commission of the offense has been established, and punishment should be imposed in accordance with its gravity.

*Mr. James J. Lynch* and *Mr. Moses H. Clift,* with whom *Mr. Judson Harmon, Mr. Robert Pritchard, Mr. William D. Spears* and *Mr. Robert B. Cooke* were on the brief, for defendant Shipp:

The testimony shows that Sheriff Shipp did not conspire, aid or abet the lynchers and did not fail in his duty to take proper precautions to guard him.

It is alleged in the information that the prisoner had been heavily guarded until the night of the lynching and that the guards were purposely withdrawn in order to permit the lynching. The record shows that the jail had not been guarded with extra guards after Johnson's conviction on February 9. During the time he had remained in the jail after his return from Knoxville, there had been no extra guard at the jail.

In their brief, counsel for the Government seem to bring a wholesale indictment against the whole citizenship of Chattanooga and Hamilton County. The undisputed testimony of dozens of witnesses is swept aside by the simple announcement that it is absurd and ridiculous. The testimony of gray-haired ministers, of veteran physicians, of merchants, manu-

facturers, and officials, is all treated in the same manner. To all of these, counsel for the Government say:

"It is absurd for the defendants and their witnesses to say that the community was in a state of peaceful repose on March 19 or preceding days. It is idle for them to say that they did not apprehend mob violence to Johnson."

And yet this fact is testified to by numerous witnesses for the Government and denied by no witness.

Judge McReynolds and Attorney-General Whittaker are also severely criticised by counsel for the Government. Just why, it is hard to understand. These gentlemen first sounded the alarm on the night of the lynching. Walking the streets about nine o'clock and noticing a suspicious gathering at the jail, they went to the office of the Chattanooga Times and notified the editor and reporters of what was going on—called the sheriff and requested him to go to the relief of the prisoner —'phoned to the office of the chief of police—and, in fact, did everything that could have reasonably been expected of any citizen under the circumstances.

Judge McReynolds treated Johnson with every consideration throughout the whole proceeding. He appointed able counsel to defend him, and after his conviction, appointed a committee of other able counsel to confer with his attorneys and render such assistance and advice as the case demanded. When counsel were appointed and before Johnson was tried, Judge McReynolds and the Attorney-General had the sheriff submit to the counsel appointed to defend Johnson all of the evidence the State had against the accused and also give Johnson's counsel the names of the witnesses for the State— a consideration for the defendant seldom, if ever before, shown in the criminal courts of this State.

After Johnson was lynched, Judge McReynolds delivered a strong charge to the grand jury, instructing that body to indict all those engaged in the lynching. Both he and Attorney-General Whittaker did everything possible to procure indictments. That the grand jury failed to indict any of

the lynchers is not strange in view of the difficulty that the Government, with all of its agents and detectives, have had in establishing the identity of those engaged in the lynching. These splendid officials need no defense at our hands. But it is quite a coincidence that counsel for the Government in their brief, criticise most severely those who did the most to avoid the lynching of Johnson.

As before stated, it is possible that Captain Shipp acted with poor judgment on the night of the lynching. It is easy to see now that he should have had the jail guarded and should have been prepared for a mob. But if he had done so, he would have been wiser and would have shown more foresight than any other citizen of Chattanooga.

It is easy to see now, looking back over events as they occurred on that night, that Captain Shipp, instead of going to the jail, should have gone to police headquarters or the armory, where the militia were drilling, and organized a posse. It must be remembered, however, that Captain Shipp did not have time to carefully consider the situation and coolly decide the best course to pursue. He was called up in the night and told by the prosecuting attorney that he should go at once to the jail—the Attorney-General showed just as poor judgment as did Captain Shipp. The Attorney-General was in conference with several other gentlemen, including the Criminal Judge, and in requesting the sheriff to go at once to the jail, he (the Attorney-General) spoke not only for himself, but for the other gentlemen present, showing that in the excitement of the moment, all of them were guilty of the same error of judgment that Captain Shipp was.

The testimony heretofore cited shows that Mr. Spurlock, who was with the judge and Attorney-General, after thinking the matter over, concluded that it would be foolish and, perhaps, dangerous, for the sheriff to rush into the jail alone, and knowing Captain Shipp's temperament, he knew he would attempt to do this. For this reason, they attempted to intercept the sheriff, but failed to do so.

Certainly Captain Shipp cannot be convicted for contempt of this court simply because in the performance of his duties, he exercised bad judgment. He says, himself, that if he had the thing to go over again he, perhaps, would know better what to do, and would act differently, but at that time he acted on the spur of the moment and had gone to the jail for the purpose of seeing what the trouble was and to do what he could to protect the prisoner.

Captain Shipp denied, in his testimony, all the charges in the information with reference to a conspiracy with those engaged in the lynching. He denied any intention to aid or abet, in any way, those engaged in the killing of Johnson. He denied that he anticipated or had any reason to anticipate or expect a mob on the night of March 19. He insisted that he had the very greatest respect for this honorable court and had done no act, and omitted no duty, from which a contrary conclusion could be drawn.

Captain Shipp has lived in Chattanooga since 1874. During that time he has been engaged in various business enterprises. During the time he has lived in Chattanooga he has been connected with various public affairs in that city. He was a Confederate soldier, and has, for many years, been a member of the Confederate Veterans' organization, and is quartermaster general of the entire organization. He was on the staff of the late Gen. John B. Gordon and the late Gen. Stephen D. Lee. He has been a Mason for over forty years and a member of numerous other secret societies. He was also tax assessor for Hamilton County, Tennessee, before elected to the position of sheriff. His splendid character is testified to by every witness whose testimony has been referred to in this brief. Old men and young men, political friends and political adversaries, ministers of all denominations, veterans of the Civil War who wore the blue and who wore the gray, men of all classes and all persuasions who have known Captain Shipp during his long life in Chattanooga, all, in one voice, say to this court that he is a truthful, law-

abiding, honorable gentleman. Can this court say that a man with such a character and such a record, would suddenly, without any motive whatever, betray his trust, sacrifice the life of a prisoner in his keeping, become a perjurer and a murderer, in order to show his contempt and disregard for the orders of this, the highest and greatest court in the world?

*Mr. James J. Lynch* and *Mr. Robert B. Cooke*, with whom *Mr. William D. Spears* was on the brief, for defendant Gibson:

The statement of the defendant as to what occurred on the night of the lynching is told in an honest, candid manner, and we submit that his statement is entitled to be believed.

The mob came to the jail and surprised him between 8:30 and 9 o'clock—battered down the door leading to upstairs where the defendant was at the time the mob arrived, and forced him to surrender the keys. Many members of the mob were armed, and they handled him roughly. He shows that he had no avenue of escape after the mob arrived, and no chance to communicate with the outside world. He was an old man 62 years old, and a veteran of the Civil War, and numerous witnesses testify to his good character.

*Mr. Robert B. Cooke* and *Mr. Moses H. Clift* for defendant Galloway:[1]

It is clear from the evidence that the defendant Galloway was not with the crowd or mob that lynched Johnson, and that when we take into consideration the manner in which this defendant exposed himself and his life for the protection and to prevent the mobbing of Johnson theretofore, as is shown by the record in this case, it seems preposterous that the able attorneys for the Government should ask this honorable court to convict or hold this defendant to be in contempt of the orders of this honorable court, on the testimony of witnesses who impeach themselves so thoroughly and so ef-

---

[1] The rule was discharged as to Galloway.

fectively that no one, much less this honorable court, could
give any credence to their statements.  The evidence estab-
lishes, beyond question, the fact that Galloway was not only
not with the mob or about the jail, or at the bridge at the
time the lynching occurred, but, as shown by the proof, was,
at the time the lynching occurred, in the Eagle Club rooms on
Market street and knew nothing of the mob until after the
lynching occurred.

This honorable court will look into the conduct and the
resistance made by this courageous, faithful officer in the de-
fense of the lives of prisoners in his hands.  It will take into
consideration all the testimony as presented in the record,
and when it does this, we feel confident that this honorable
court will discharge this faithful officer, as well as all the offi-
cers, including the sheriff and each of his deputies, and com-
mend their faithfulness as officers in the discharge of their
duty.

*Mr. G. W. Chamlee,* with whom *Mr. J. A. Hood, Mr. W. H.
Cummings* and *Mr. W. F. Chamlee* were on the brief, for de-
fendant Ward:[1]

The Government has failed to make out its case against
the defendant Ward, who is entitled to his discharge be-
cause the proof fails to show that he had any connection
whatever with the lynching, and also fails to show that he
had any knowledge of the fact that this honorable court had
acquired jurisdiction of the case of Johnson *v.* Tennessee,
and in the absence of such information he could not be
guilty of contempt of this honorable court.  To make the
defendant guilty of a contempt it is necessary that he should
have in his mind at the time of the commission of the un-
lawful act, knowledge that this honorable court had taken
jurisdiction of the Johnson case and his participation either
by aiding or abetting in the alleged lynching should be

---

[1] The rule was discharged as to Ward.

prompted by a spirit of disrespect for its orders. On both of these questions the Government has wholly failed to make out its case.

The evidence shows that at the very hour of the lynching the defendant was at Barnes' saloon under the influence of strong liquor to such an extent that the witnesses say he was drunk, and probably asleep.

This defendant is an innocent man. The proof against him is in the testimony alone of one Stonecipher who has been successfully impeached and this defendant has proven a satisfactory alibi and lack of knowledge of the jurisdiction of this court over the Johnson case.

*Mr. G. W. Chamlee,* with whom *Mr. W. H. Cummings* and *Mr. W. F. Chamlee* were on the brief, for defendant Williams:

There is enough in this record to show beyond any question or controversy that Mr. William's record for truth and veracity is good and that he is entitled to full faith and credit on his oath in a court of justice.

The Government has failed to show that Mr. Williams did anything in the world in aiding or assisting in the lynching of Ed Johnson. It has failed to show that he had any knowledge that this honorable court had acquired jurisdiction of the case of Johnson v. Tennessee. His answer denies every material allegation made against him in the information filed by the Attorney-General.

Counsel for the Government in the brief for the Government leave the impression that Mr. Ware swears positively that Mr. Williams was the man that shot five bullets into the dead body of Johnson as it lay on the county bridge. This is shown to be clearly erroneous, and a careful reading of Mr. Ware's testimony does not sustain the contention of counsel for the Government. It is most earnestly insisted that the proof shows that Mr. Williams was simply present as a spectator as were numbers of other people, but that he took no part in the lynching and is not guilty in any manner

or in any sense of the charges made and was in no way responsible for the death of Ed Johnson. It is, therefore, confidently urged that the charge against Mr. Williams is not proven and that he should be dismissed.

*Mr. T. Pope Shepherd,* with whom *Mr. Lewis Shepherd* and *Mr. Martin A. Fleming* were on the brief, for defendants Nolan, Justice,[1] Padgett and Mayse:

These defendants are charged with being members of the mob that lynched Johnson. They are not interested in the details of the occurrence at the county jail and bridge on the night of the lynching except to deny their presence and participation nor are they interested in the proof showing the history of the Johnson case and the condition of public sentiment with reference thereto. The only question to be considered, so far as these defendants are concerned, is their participation in the lynching.

Each one of the defendants filed an answer to the information denying his respective participation in the lynching and showing where he was on this particular night.

While the defense of each is separate and distinct and will be hereinafter treated separately there are some questions that may properly be considered as applying to all alike and will be treated in one discussion.

The Johnson case has been a famous case in and around Chattanooga, Tennessee, from the time the crime was committed, until the present time. From the whole record it will be seen and can properly be inferred that the facts connected with the case have been prominently in the minds of the Chattanooga people at all times. Every step in the case was watched with intense interest by almost every citizen and the subject was, evidently, constantly under discussion during the time from the arrest of Johnson to the night of the lynching. So in times of such great interest it is comparatively an easy matter for a man to remember his actions and wherea-

---

[1] The rule was discharged as to Justice.

bouts on that eventful night in the city of Chattanooga. At any ordinary time, or upon any ordinary night where there is nothing to particularly impress one's mind at that time or later, it is usually a difficult matter, after a lapse of a few weeks, to fully remember the occurrences of such a time or with certainty to identify such time with particular occurrences. But it is different at times of extraordinary events, whether such events are known at the time or ascertained later. A report on the following morning of some extraordinary occurrences of interest to every one in a community would have the result of recalling vividly to one's mind where he was and what he had been doing at such time. It is therefore entirely reasonable that these defendants could give an account of their actions on the night of March 19, 1906, when Johnson was lynched. And it is also entirely reasonable that their several actions could be identified with this particular night.

Nolan denied his presence and participation in the lynching of Johnson, and showed where he was on that night during the time of the lynching. He was at his place of business over a mile from the county jail up to about 9:30 P. M., that he then went to the saloon of his brother and remained there until a little after 10 P. M. at which time the saloon was closed for the night, that he then went to his home near by and there remained until the following morning. This is supported by the testimony and contradicts the testimony to the contrary that Nolan was in the crowd. Some of the Government's witnesses testified that he was masked and others that he was not. He was not fully identified, and the record of the witnesses who testified that they saw him is bad.

Under a fair construction of all the evidence the Government has failed to show Nolan's participation in the mob. His alibi is well supported by competent proof and his defense is sustained by the great weight of the evidence.

Defendant Justice denies that he was at the county jail

on the night of the lynching, or that he had any connection with or knowledge of the mob or lynching of Johnson. On that night he was at his home in St. Elmo several miles from the jail, and a part of the time visiting at a neighbor's house.

In the brief counsel for the Government first say that it must be remembered that this defendant was a member of the first mob that tried to lynch Johnson.

Defendant was asked about this. He stated that he was present as a spectator in company with such men as Judge McReynolds, Attorney-General Whittaker and H. Clay Evans. He was requested to act on a committee to examine the jail. Later defendant made a speech advising the crowd to disperse. Defendant is six feet one inch high and weighs from 215 to 236 pounds.

The man identified as Justice was evidently the leader of the mob, but the parties must have been mistaken and one witness says there was a man in the mob who did resemble Justice.

Defendants Padgett and Mayse answered denying their participation in the lynching. Padgett shows that he was at the Stag Hotel during the evening of the day of the lynching.

Mayse shows that he was at home after about 6 o'clock P. M. Neither knew anything of the lynching until the next morning.

The witnesses as to the alibi testified in a straightforward, intelligent manner. There is nothing so remarkable in their testimony as to justify the statement in counsel's brief that they are unworthy of belief. True, they are friends and associates of the defendant, but where could he get proof of his whereabouts except from his associates? Each one gives a reasonable account of his actions that night and a proper reason for remembering the details. It is not quite fair to charge that witnesses are unworthy of belief because, perchance, they have testified in favor of the opposite side in a lawsuit. There should be some respectable evidence on which to base such charge before it is justified.

The Government relies on the testimony of one Stonecipher.

There is no proof that these defendants were seen at the jail that night. The case is based on certain statements and admission made by them to Stonecipher who says there was a conversation before the lynching in which Padgett and Mayse were expressing dissatisfaction with the course of the Johnson case. There is nothing in this conversation to show that these parties were intending or making preparations to lynch Johnson; and on the next day Stonecipher claims that he heard a conversation between Padgett and another in which Padgett admitted that he and Mayse were participants and Padgett admitted his complicity—all of which both Padgett and Mayse denied—and so the witness Stonecipher stands alone and unsupported in his statements, and is contradicted by both defendants and other testimony.

Padgett does not remember what was said except that he did not state that he was a member of the mob. It is a remarkable proposition that a man would openly in a public place to a mere acquaintance state that on the night before he had committed murder. Stonecipher's story is highly unreasonable, and for that reason should be given less weight than evidence of a reasonable nature.

Then again the nature of the conversation is such that a court cannot afford to call it evidence. At the most it was thoughtless, idle talk or as sometimes expressed as barroom gossip. It cannot be considered as sufficient proof of murder.

If all that Stonecipher says is true and it should be considered as a confession, there is not a case made out for the reason that defendants have shown by an abundance of competent proof that they did not participate in the mob. Under the rule of first trying to make all the witnesses speak the truth the innocence of defendants is consistent with the testimony of every witness.

Witnesses who have known Stonecipher since he was a boy and know his reputation both in Chattanooga and in his former Georgia home, unhesitatingly say that his reputation is bad and that he is not entitled to credit on his oath.

Giving Stonecipher's testimony the most favorable light it does not in any degree prove participation, nor overcome the alibis set up and relied on by these defendants.

These cases are in effect criminal cases, and in weighing the evidence the rules in criminal cases should prevail.

Whether the reasonable doubt rule should prevail or not the court should require strong and convincing proof before convicting these defendants and inflicting punishment. The evidence should be stronger than a mere preponderance as in civil cases. There is something more important than property rights and consequently more strictness required. The freedom and liberty of a citizen should not be taken except on the strongest and most convincing proof.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

This was an information filed by the Attorney-General of the United States against Joseph F. Shipp and twenty-six other defendants,[1] which was dismissed as to eighteen of them and heard as to defendants Shipp, Galloway, Gibson, Nolan, Williams, Justice, Padgett, Mayse and Ward.

The information charged, in substance, that February 11, 1906, Ed Johnson, a negro, was convicted of rape by the criminal court of Hamilton County, Tenn., held in Chattanooga, and was sentenced to death; that on March 3, following, Johnson filed a petition for the writ of *habeas corpus* in the United States Circuit Court, sitting in Tennessee, alleging that in the trial he had been deprived of constitutional rights; that on March 10 the petition was dismissed and the writ denied, petitioner being remanded to the sheriff of Hamilton County to be detained in his custody for ten days, in which to enable petitioner to prosecute an appeal, and in default of such appeal to be further proceeded with by the state court under its sentence; that on March 17 Mr. Justice Harlan, of the United

---

[1] The information at length and names of all defendants appear at page 439, *post*.

States Supreme Court, allowed an appeal from the decision of the Circuit Court, and on March 19 an order was made by the Supreme Court allowing said appeal; that defendant Shipp, sheriff of Hamilton County, then was at once notified by telegraph of said order, which stayed all proceedings against Johnson, and required Shipp to retain custody of Johnson pending determination of the appeal; that before 6 o'clock in the evening of March 19 a full account of this action of the Supreme Court was published and circulated in the evening papers in the city of Chattanooga; that defendant Shipp was the sheriff of Hamilton County and defendants Matthew Galloway and Jeremiah Gibson, among others, were his deputies; that the deputies as well as the sheriff were fully advised of the action of the Supreme Court, and were informed and had every reason to believe, from current reports and rumors conveyed to them, that an attempt would be made on the evening of the nineteenth or early in the morning of the twentieth, by a mob composed of a large number of armed men, to force an entrance into the county jail for the purpose of taking Johnson therefrom and lynching him; that notwithstanding said information and said reports the sheriff withdrew from the jail early in the evening of the nineteenth the usual and customary guard, and left in charge thereof only the night jailer—defendant Gibson—and committed other acts and did other things evincing a disposition on the part of said sheriff to render it less difficult and less dangerous for the mob to prosecute and carry into effect its unlawful design and purpose of lynching Johnson; that about 9 o'clock in the evening of said March 19 defendants and others conspired to break into the jail for the purpose of taking Johnson therefrom and lynching him, with intent to show their contempt and disregard for the above-mentioned order of this court, and prevent it from hearing the appeal of Johnson; that pursuant to this conspiracy and in order to show their contempt and disregard for said order of this court, between 9 and 12 o'clock in the evening of said March 19, at Chattanooga, Tenn., defendants, excepting Shipp

and Gibson, assembled with others, broke into the jail, took Johnson out by force, and lynched him; that Gibson was the only officer at the jail when the mob broke in, and that while the mob was in possession of the jail defendant Shipp arrived, but made no effort to prevent the mob from taking Johnson from the jail; that defendants Shipp and Gibson were in sympathy with the mob while pretending to perform their official duty of protecting Johnson, and that they aided and abetted the mob in prosecution and performance of the lynching; that all of these acts were committed by defendants with the intent upon their part to utterly disregard the above-mentioned order of this court and to prevent the court from hearing Johnson's appeal.

The answers on questions of fact consisted of a general denial and, except in the cases of Shipp, Gibson and Williams, the setting up of an alibi by each defendant. Williams admits that he was at the jail a short time before and at the time Johnson was taken from it by the mob, and that he followed the mob and witnessed the lynching, but denies participating in the acts of the mob.[1]

Certain preliminary questions of law were raised by defendants and passed upon by the court. 203 U. S. 563.[2] It was held that the complaint sufficiently set forth a contempt of this court; that it was unnecessary for the purposes of this proceeding to determine whether or not the Circuit Court had jurisdiction of the *habeas corpus* proceedings or whether this court had jurisdiction to entertain the appeal, as those were questions for this court to determine and for no other tribunal; and that the answers of the defendants, under oath, disavowing intent did not purge them.

The case then came on to be heard on the question whether the allegations of the information were made out.[3]

---

[1] For abstracts of answers of defendants, see page 447, *post.*

[2] For opinion of Mr. Justice Holmes see page 457, *post.*

[3] For order appointing commissioner to take testimony, etc., see page 471, *post.*

The following is a sufficient *resumé* of the facts admitted or undisputed:

January 23, 1906, a rape was committed upon a white woman in or near Chattanooga, Hamilton County, Tenn.

At that time and at all times hereinafter mentioned defendant Shipp was the duly elected, qualified and acting sheriff of Hamilton County, Tenn., and as such sheriff had and exercised full charge and control of the county jail located in Chattanooga, and was the legal custodian under the laws of Tennessee of all persons duly committed in said county under the laws of the State to confinement and imprisonment within the jail, and the defendants Matthew Galloway and Jeremiah Gibson were duly appointed, qualified and acting deputy sheriffs under Shipp.

January 25 Shipp and his deputies arrested Ed Johnson, a negro, in or near Chattanooga, charged with the crime.

Late in the afternoon of the same day Johnson was, by order of the judge of the state criminal court, taken by Sheriff Shipp to Dayton and from there to Nashville, where he was kept until the day of his trial, February 6. Johnson was removed and kept away from Chattanooga during this period because of fear that he would be lynched.

The night of January 25 a large mob attacked the jail at Chattanooga, where Johnson was supposed to be confined.

Three of Shipp's deputies were at the jail, and, with the assistance given them by the police, the chairman of the safety committee, and others, prevented the taking of any prisoners from the jail.

At the suggestion of the deputies the mob appointed a committee to go through the jail and satisfy itself that Johnson was not there.

Even after this committee had reported that the persons whom the mob sought were not in the jail, it was necessary to use force to put the mob out of the jail yard.

The dangerous character of this committee and the mob and their anger at not being able to find Johnson is shown by the

testimony of the prosecuting officer for Hamilton County; the judge of the criminal court of that county; and defendant Galloway.

One other night, about the same time, the officers thought there was to be a mob. The militia was called out twice about that time to protect the jail against a mob which sought to take Johnson's life.

January 26 a special grand jury was convened, and the next day indicted Johnson for the crime above referred to.

February 6 Johnson was brought to Chattanooga from Nashville and his trial commenced that day in the criminal court of Hamilton County. February 9 he was convicted and sentenced to death.

The date of execution was originally fixed as March 13, but on or about March 11 was changed by the governor to March 20.

No appeal to the Supreme Court of the State was taken by the lawyers appointed by the court to defend Johnson.

Two daily papers were published in Chattanooga—The Times, a morning paper, and The News, an evening paper, both having a large circulation. Three competent and leading attorneys had been appointed by the court to defend Johnson, and one of them made a statement, which was published in The Chattanooga Times of February 10, as to the reasons why an appeal was not prosecuted in Johnson's behalf. He depicts the mental strain that he and his associates had been under, and the weight of the burden of the responsibility upon them. He says that when the jury brought in a verdict of guilty "we, as the attorneys, had to settle the question whether the case would be appealed to the Supreme Court." He asked the trial judge to appoint three other lawyers to counsel and advise with them and help to share the responsibility, and three well-known lawyers were designated, who met with the three counsel for the petitioner and considered the matter.

"We discussed the recent mob uprising and the state of unrest in the community. It was the judgment of all present

that the life of the defendant, even if the wrong man, could not
be saved; that an appeal would so inflame the public that the
jail would be attacked and perhaps other prisoners executed
by violence.   In the opinion of all of us a case was presented
where the defendant, now that he had been convicted by a
jury, must die by the judgment of the law, or else, if his case
were appealed, he would die by the act of the uprising of the
people.''

     *     *     *     *     *     *     *     *
    "In view of all the conditions, it was the unanimous vote
that the law ought to be allowed to take its course if Judge
McReynolds were satisfied with the verdict, and if he were to
approve it and pass judgment of death on it.''

He then relates an interview had thereupon with the ac-
cused.   His right of appeal was explained to him, "that the
Supreme Court met in September next; that an appeal would
stay the judgment until that time; that we did not see any rea-
sonable ground to suppose that the Supreme Court would re-
verse the sentence, and that we feared an appeal would cause
mob violence against him.''

     *     *     *     *     *     *     *     *
    "Without giving all that occurred at the jail, he said to us
that he did not want to die by a mob; that he would do as
we thought best.   He said he would go over to the court house
and tell the judge that he did not have anything more to say
than that he was not the guilty man.

    "I want the people to know that the foregoing facts moved
us to allow the law to take its course under the verdict of the
jury and the judgment of Judge McReynolds.   Six lawyers
settled it in this way after the calmest reflection and under the
keenest sense of the great responsibility.

    "In view of the awfulness of the crime committed, I beg
that the sheriff and every peace officer of Chattanooga and
Hamilton County will still try to get all possible further light,
and if any person anywhere knows anything whatever tending
to show or reflect light on either the guilt or innocence of the

defendant, I beg that such person make known all that he may know to us or to Attorney-General Whittaker."·

On the afternoon Johnson was convicted he was secretly taken from Chattanooga to Knoxville because of fear of mob violence to him.

From the time the crime was committed until after Johnson's trial the people of Chattanooga were greatly excited over the crime and Johnson's alleged connection with it, and there was great apprehension on the part of the people as well as the officers that attempts would be made to lynch Johnson.

It was because of this intense excitement and the feeling that speedy execution of Johnson might prevent his being lynched that Johnson was so quickly indicted and tried.

While the trial was in progress extra deputies were sworn in and an unusual number of guards were kept around the court house and at the jail at night.

Guns to be used in protecting the jail against a mob were purchased.

March 3 Johnson filed a petition for a writ of *habeas corpus* in the United States Circuit Court for the Northern Division of the Eastern District of Tennessee.

March 10, 1906, the petition was denied, the Circuit Court ordering that Johnson be remanded to the custody of the sheriff of Hamilton County, Tenn., to be detained by him for ten days in which to enable petitioner to prosecute an appeal from said order, and in default of the prosecution of said appeal within that time to be then further proceeded with under the sentence.

This order was made public through the press.

Johnson was at Knoxville, where he had been kept since his conviction, for hearing upon his petition, and was taken back to Chattanooga, March 11.

Saturday, March 17, application was duly presented by Johnson to Mr. Justice Harlan of the Supreme Court of the United States (Circuit Justice of the Sixth Circuit), at Washington, asking that an appeal be allowed to that court from the order

of the Circuit Court, denying Johnson's petition for a writ of *habeas corpus.* This appeal was allowed by Mr. Justice Harlan on the same day.

March 18, The Chattanooga Times published notice that application for said appeal had been made.

The same day Judge Clark, of the United States Circuit Court, received a telegram from Mr. Justice Harlan, which was communicated to Sheriff Shipp on the afternoon of that day, that he had allowed appeal to accused in *habeas corpus* case of Ed Johnson; that the transcript would be filed the next day, and motion also be made by Johnson's counsel for formal allowance of appeal by the Supreme Court.

March 19, The Chattanooga Times published news of the allowance of the appeal by Mr. Justice Harlan; in which it said, among other things:

"From these authorities it was learned that the granting of an appeal in a case like this acted to supersede all process in the state courts. No stay is necessary, according to the authorities, and the statute is self-operative. Pending a decision of the appeal there can be no execution by any state authority."

March 19 an order was made by the United States Supreme Court, allowing an appeal to that court from the final order of the Circuit Court denying petition for writ of *habeas corpus,* and directing that all proceedings against the appellant be stayed, and that the custody of appellant be retained pending the appeal.

About 1 o'clock in the afternoon of said March 19 the following telegram was delivered to a telegraph company for transmittal to the addressee:

"Washington, March 19, 1906.

"To Sheriff of Hamilton County, Tenn., Chattanooga, Tenn.

"Supreme Court of United States has allowed Ed Johnson appeal from Judge Clark's order, and directed all further proceedings stayed, and custody of Johnson retained pending

appeal here.　See Section 766, Revised Statutes of the United States.

"JAMES H. McKENNEY,
　"*Clerk Supreme Court, U. S.*"

This was received by the telegraph office at Chattanooga about 3.30 on the same afternoon and delivered between 4 and 5 o'clock on that afternoon.

About 2 o'clock on the afternoon of the nineteenth Judge Mc-Reynolds told Sheriff Shipp that the Supreme Court had granted a stay in the Johnson case, and that thereafter Johnson was a Federal prisoner.

Between 2 and 4 of the afternoon of March 19 the following telegram was received by Judge Clark, and by his secretary communicated to Sheriff Shipp, at the jail, about 5 o'clock that afternoon, with a copy of the statute therein referred to:

"Washington, D. C., March 19, 1906.
"Hon. C. D. Clark, United States Court, Chattanooga, Tenn.

"Court has just allowed appeal in Johnson's case, and ordered all further proceedings against him delayed and custody retained pending appeal here. It will be well to call attention of state officers immediately to Section 766 of Revised Statutes.
　"JOHN M. HARLAN."

The statute referred to reads (including the proviso added March 3, 1893):

"Pending the proceedings on appeal in the cases mentioned in the three preceding sections and until final judgment therein, and after final judgment of discharge, any proceedings against the person imprisoned or confined or restrained of his liberty, in any State court, or by or under the authority of any State, for any matter so heard and determined, or in process of being heard and determined, under such writ of *habeas corpus,* shall be deemed null and void.

"*Provided,* That no such appeal shall be had or allowed after

six months from the date of the judgment or order complained of."

Shipp understood that thereupon Johnson was held as a Federal prisoner.

There was published and circulated in Chattanooga, in the evening paper published in that city, on March 19, about 4 o'clock, an account of said action of the Supreme Court, under the headlines, "An Appeal is Allowed. Ed Johnson Will Not Hang To-morrow." This reads, in part:

"The gallows in the Hamilton County jail has again been disappointed in the case of Ed Johnson, convicted by the state courts of rape and sentenced to death. The hanging will not take place to-morrow morning, as scheduled."

The news of the action of the court was also posted on a newspaper bulletin.

After hearing of the stay Shipp says that he made no effort and gave no orders to have deputies or others guard the jail, but left the night jailer, defendant Gibson, there alone.

The county jail at Chattanooga, in which Johnson was confined on the nineteenth, consisted of four stories, two above ground and two below ground. Entrance to the jail was on the third floor, counting from the bottom. In the front part of the building, on this third floor, was an office section. An iron door led from this section into the jail proper; that is, the protected part of the building, where the prisoners were kept. Johnson was confined on the top floor. To reach him from outside the jail it was necessary to go through the offices, through the iron door between the offices and the jail proper, up a flight of stairs, through a steel-barred door, right behind which was a circular door consisting of heavy steel bars several inches apart, which revolved so as to make a passage. Passing through this circular door one came into a corridor around which were cells having iron doors which could be locked. It was in one of these cells that Johnson was confined.

The jail was located in a populous neighborhood and there were houses around it.

In the evening of the nineteenth a white male prisoner was removed from the upper floor of the county jail in Chattanooga, leaving only Johnson and a white woman on that floor.

This same man had been removed in the same way at the time of the first attempt to lynch Johnson.

About half-past 8 or 9 that night a number of men entered the jail and went directly and without resistance to the door leading to Johnson's corridor. There is a conflict of evidence as to whether the door leading from the offices to the jail proper was locked during the evening, but if it was locked when the mob came it was easily broken down.

Gibson was the only officer there at the time, and he was on the top floor with Johnson.

Keys were obtained from him without resistance, but, as the lock on the door leading to the corridor where Johnson's cell was located had been broken by a member of the mob, the keys would not work.

The mob, with sledge and ax, then began to break the bolts on the corridor door.

About twelve men were actively engaged in breaking down the door and in all subsequent events of the lynching. Some of these men were masked.

A crowd of spectators began to gather around the jail soon after the mob reached it, and continued to gather in and around the jail until Johnson was taken out. This crowd was variously estimated from a few to 150 or more.

It took over an hour to break the bolts on the corridor door.

Two men then went through the circular door and in a few minutes brought Johnson out with his arms tied with a rope.

When Johnson was thus brought out, the dozen men or so composing the mob grabbed him.

This mob took Johnson from the jail to the county bridge over the Tennessee River, which was about six blocks from the jail.

Johnson was taken from the jail a little after 10 o'clock.

From the foregoing it is apparent that there was no inter-

ference or attempted interference of any consequence with
the mob before it left the jail, and there was none after it left.

The crowd which had gathered around the jail followed the
mob down to the bridge.

When the bridge was reached the mob took Johnson a little
beyond an arc light, put a rope around his neck, threw it over
a beam, and swung him up.

At the bridge the mob actively engaged in lynching Johnson
were close to him and separated by a space from the crowd of
spectators.

The first time Johnson was swung up, the rope broke or
slipped and he fell. He was swung up a second time and shot.
After some shots were fired, Johnson again fell, and while lying
on the ground was again shot. It was about ten minutes after
the mob had reached the bridge until Johnson was killed.

It is apparent that a dangerous portion of the community
was seized with the awful thirst for blood which only killing
can quench, and that considerations of law and order were
swept away in the overwhelming flood. The mob was, how-
ever, willing at the first attempt to accept prompt administra-
tion of the death penalty adjudged at a trial conducted accord-
ing to judicial forms, in lieu of execution by lawless violence,
but delay by appeal, or writ of error, or *habeas corpus* was not
to be tolerated.

Under then existing statutory provisions appeals might be
taken to this court from final decisions of the Circuit Courts
in *habeas corpus* in cases, among others, where the applicant
for the writ is alleged to be restrained of his liberty in violation
of the Constitution or of some law or treaty of the United
States, and if the restraint was by any state court, or by or un-
der the authority of any State, further proceedings could not
be had against him pending the appeal. Rev. Stat., §§ 763,
764, 766; Act of March 3, 1885, c. 353, 23 Stat. 437.

In this instance an appeal was granted by this court, and
proceedings specifically ordered to be stayed. The persons
who hung and shot this man were so impatient for his blood

that they utterly disregarded the act of Congress as well as the order of this court.

As heretofore stated, the defendants to the information remaining to be dealt with on the facts are Shipp, Galloway, Gibson, Nolan, Williams, Justice, Padgett, Mayse and Ward. Of these, Shipp was the sheriff and Galloway and Gibson two of his deputies. The others are charged with active participation in the lynching. It is contended that the lynching was not expected to occur on the nineteenth, and the evidence of the United States District Judge, and some clergymen and others was given to the effect that they had no such anticipation. The event showed that they were wrong, and it is plain the danger might be very great and yet remain unperceived by the adherents of order and peace.

It will be remembered that the crime was committed on January 23, and Johnson was arrested January 25. That night a mob attacked the jail in which he was supposed to be and ascertained that he was not there. Johnson was kept in Nashville from that day until his trial commenced, February 6. On his conviction, February 9, he was taken away from Chattanooga and kept away until March 11, the day after his petition for *habeas corpus* was denied.

It must be admitted that intense feeling against Johnson existed from the time of the commission of the crime until after his conviction, and that this feeling frequently manifested itself, although Johnson was not in Chattanooga from the time of his arrest until his trial began. The intensity of this feeling and the great apprehension of the officers of mob violence is shown in the testimony of defendants' own witnesses, describing the precautions and secrecy exercised by them in the way they took Johnson in and out of Chattanooga, as well as by the fact that they kept him away from Chattanooga from the day of his arrest until March 11, two days before the time set for his execution, with the exception of the three days he was there attending his trial. Undoubtedly the public believed that Johnson would be executed on March 13,

until the reprieve to March 20 was granted on March 11; and after the petition for *habeas corpus* was denied by the Circuit Court believed that Johnson would then be executed on the twentieth.

Sheriff Shipp testifies that inflammatory reports of the *habeas corpus* proceedings and efforts to appeal the case to the Supreme Court were sent out by the newspapers on March 11, and because of that he had fear of mob violence to Johnson. The efforts made by Johnson's attorneys to obtain an appeal were kept before the public by the newspapers.

March 16 The Chattanooga Times published a statement that a negro attorney had gone to Washington to obtain an appeal from the order denying the petition for *habeas corpus*. The article said:

"People here are decidedly anxious as to whether Johnson is to suffer death for his crime next Monday or escape for an indefinite period by reason of intervention of the court at Washington. More unrest on the subject exists than was anticipated when Johnson was brought back to the county.

*     *     *     *     *     *     *     *

"During the recent days of suspense as to his execution the desire for information has been feverish, and telephones at localities where information has been thought to be obtainable have been kept busy by inquirers."

In The News, published the evening of March 19, there was an editorial reviewing the local proceedings, which concluded:

"All of this delay is aggravating to the community. The people of Chattanooga believe that Johnson is guilty and that he ought to suffer the penalty of the law as speedily as possible. If by legal technicality the case is prolonged and the culprit finally escapes, there will be no use to plead with a mob here if another such crime is committed. Such delays are largely responsible for mob violence all over the country."

The assertions that mob violence was not expected and that there was no occasion for providing more than the usual guard

of one man for the jail in Chattanooga, are quite unreasonable and inconsistent with statements made by Sheriff Shipp and his deputies that they were looking for a mob on the next day. Officers and others were heard to say that they expected a mob would attempt to lynch Johnson on the twentieth. There does not seem to be any foundation for the belief that the mob would be considerate enough to wait until the twentieth. If the officers expected a mob at all, as they say that they did, they cannot shield themselves behind the statement that they expected it on the twentieth, the day that had been appointed for Johnson to die, and did not expect it the night before. But no orders had been given and nothing had been done up to half-past eight o'clock on the night of the nineteenth to protect Johnson from the mob which was, according to their present statements, expected the next day.

Testimony was given by a servant in Shipp's house that a week before Johnson was lynched Shipp was heard to say that if the execution were stayed Johnson would be mobbed. This was, however, disputed by Shipp and relatives of his who were there at the time.

On May 28, at Birmingham, Alabama, defendant Shipp himself, in an interview reported and printed the next morning in The Birmingham Age-Herald, said:

"'The first I knew of the mob was through a telephone message I received from The Chattanooga Times office, for they had cut the wires at the county jail immediately upon their arrival. I dressed as quickly as possible and went to the jail, and found a crowd of about seventy-five people around it, most of them being in disguise. I made my way through the crowd into the jail and began remonstrating with them against taking any drastic steps. They seized me and took me upstairs, locking me up in a bathroom. The members of the mob told me they meant no violence to me. I argued with them against doing anything at all, since the law had so far taken its proper course. *I am frank to say that I did not attempt to hurt any of them, and would not have made such an attempt if I could.*

In the first place, I could have done no good, as I was over-whelmed by numbers.

" 'The Supreme Court of the United States was responsible for this lynching. I had given that negro every protection that I could. For fourteen days I had guarded and protected him myself. The authorities had urged me to use one or two military companies in doing so, but I told them I would land the negro in jail, which I did, individually.

" 'Many nights before the lynching there had been a suffi-cient guard around the jail. *I had looked for no trouble that night and, on the contrary, did not look for it until the next day.* That night no one was on duty except the jailer, which is the usual guard at our jail, as well as in other counties.

" 'In my opinion the act of the Supreme Court of the United States in not allowing the case to remain in our courts was the most unfortunate thing in the history of Tennessee. I was determined that the case should be put in the hands of the law, as it was. The jury that tried the negro Johnson was as good as ever sat in a jury box.

" 'The people of Hamilton County were willing to let the law take its course until it became known that the case would not probably be disposed of for four or five years by the Su-preme Court of the United States. The people would not sub-mit to this, and I do not wonder at it.

" 'These proceedings in the United States Supreme Court recently appear to me to be only a matter of politics. I do not wish to appear in the light of defying the United States court, but I did my duty. I am conscious of it, thoroughly con-scious of it, and I am ready for any conditions that may come up.' "

The testimony of the reporter that Shipp made these state-ments was corroborated by the evidence of another reporter who interviewed Shipp on the following day regarding them, and is not denied by Shipp except in an immaterial particular. From this it appears that defendant Shipp looked for trouble on the twentieth, but, as he says, not that night; that he did

not attempt to hurt any of the mob, "and would not have made such an attempt if I could."

He evidently resented the necessary order of this court as an alien intrusion, and declared that the court was responsible for the lynching. According to him, "the people of Hamilton County were willing to let the law take its course until it became known that the case would not probably be disposed of for four or five years by the Supreme Court of the United States." "But," he added, "the people would not submit to this, and I do not wonder at it." In other words, his view was that because this court, in the discharge of its duty entered the order which it did, that therefore the people of Hamilton County would not submit to its mandate, and hence the court became responsible for the mob. He took the view expressed by several members of the mob on the afternoon of the nineteenth and before the lynching, when they said, referring to the Supreme Court, that "they had no business interfering with our business at all." His reference to the "people" was significant, for he was a candidate for reëlection and had been told that his saving the prisoner from the first attempt to mob him would cost him his place, and he had answered that he wished the mob had got him before he did.

It seems to us that to say that the sheriff and his deputies did not anticipate that the mob would attempt to lynch Johnson on the night of the nineteenth is to charge them with gross neglect of duty and with an ignorance of conditions in a matter which vitally concerned them all as officers, and is directly contrary to their own testimony. It is absurd to contend that officers of the law who have been through the experiences these defendants had passed through two months prior to the actual lynching did not know that a lynching probably would be attempted on the nineteenth. Under the facts shown, when the sheriff and his deputies assert that they expected a mob on the twentieth, they practically concede the allegation of the information that they were informed and had every reason to believe that an attempt would be made on the evening

of the nineteenth or early on the morning of the twentieth.

In view of this, Shipp's failure to make the slightest preparation to resist the mob; the absence of all of the deputies, except Gibson, from the jail during the mob's proceedings, occupying a period of some hours in the early evening; the action of Shipp in not resisting the mob and his failure to make any reasonable effort to save Johnson or identify the members of the mob, justify the inference of a disposition upon his part to render it easy for the mob to lynch Johnson, and to acquiesce in the lynching. After Shipp was informed that a mob was at the jail, and he could not do otherwise than go there, he did not and in fact at no time hindered the mob or caused it to be interfered with, or helped in the slightest degree to protect Johnson. And this in utter disregard of this court's mandate and in defiance of this court's orders.

Let us recapitulate the facts bearing immediately on defendant Shipp.

About 9 o'clock on the night of the nineteenth the judge before whom Johnson was tried, and the attorney who prosecuted him, communicated with Sheriff Shipp at his house, saying that there were persons around the jail who looked suspicious, and suggesting that the sheriff had better go down to the jail.

At that time a report was generally circulated in the city that a mob was at the jail to lynch Johnson.

Shipp lived only a few blocks from the jail. He reached the jail about nine. He was alone. A number of people were in the jail and outside of it when he arrived. He anticipated a mob was inside.

Without stopping to speak to any of these people he rushed inside of the jail to the foot of the stairs leading to the floor Johnson was on. There he was taken hold of by five or six men and carried upstairs. The men who took hold of him had no firearms.

At first he was put in a bathroom, and then was released and stood around near the corridor door, where the mob was at

work, with three or four unarmed men around him. He made no effort to get away or use force in opposing the mob. He did not attempt to use his pistol or call for help. After the corridor door had been broken in, either Shipp or defendant Gibson told the mob which cell Johnson was in. When the mob left the jail with Johnson, Shipp did not follow or make any effort to rescue Johnson or get others to help rescue him. He was not locked up when the mob left the jail, but was left entirely free.

When the crowd following the lynchers was about two blocks from the jail, Shipp came out of the building alone and unguarded. To a request made by a man at that time to go and identify members of the mob, Shipp replied that it would be dangerous and foolish. This request was made before the shooting occurred.

A special deputy met Shipp at the jail just after Johnson had been taken out and before he was shot. Shipp told him that the mob had Johnson. Shipp was quiet, and made no effort to go after the lynchers, or to reach the police or militia or others.

When he reached the jail he could have gone about three blocks to the police station and got the police.

No alarm bell was rung at the court house that night, although it was rung the night of the attempted lynching January 25, and it drew out a big crowd. No attempt was made by Shipp or others to summon a posse. He sent no one after deputies. He made no effort to send any one for help.

It is testified that some time after the mob had left the jail for the bridge, Shipp sent Galloway and Clark down to the bridge, but he made no effort to go himself.

There was in the crowd around the jail and at the scene of the lynching a substantial number of law-abiding men of good character.

That assistance in suppressing the mob might have been easily obtained if effort had been made is shown by the testimony of the chairman of the board of safety, who testifies that at the time of the first lynching in going four or five

blocks to the jail he gathered about 16 men to help put down the mob.

The militia was drilling on the night of the nineteenth between 8 and 10.30 in the armory, a well-known place, three blocks from the jail. It was not called upon to assist in suppressing the mob, although it had been called out twice before by the governor, and was bound to respond to another call by him.

The governor had given assurances that any help asked for would be given, and we have no doubt he would have responded, for he would have had the honor of Tennessee in his keeping.

Numerous witnesses testify that no firearms were displayed by the mob except that one of their number was in the office of the jail with a Winchester rifle, and one pistol was exhibited to a reporter when the door was being broken open.

No deputies put in an appearance while the mob was at the jail or during the lynching, except Frank Jones, who approached the jail with a prisoner, but upon seeing the mob immediately left with the prisoner, and excepting Matt Galloway, who was seen in the crowd.

From the time he reached there, about 6 o'clock, until the mob came, Gibson was the only officer in charge of the jail. But there was much evidence that customarily many deputies were there nightly, and that several were present on the night of the nineteenth until just before the irruption of the mob.

Heavy iron chains were sometimes used as additional guards upon circular doors in the jail, such as that leading to Johnson's corridor. These were locked by the prisoners on the inside. During the trial of Johnson these chains were used on the circular doors. But none were on the circular door leading to Johnson's cell on the nineteenth. It also appears that Johnson's cell door was not locked.

Winchester rifles which were kept to defend the jail against mob violence were, at the time the mob attacked the jail on

the nineteenth, in a show case in the office. These were taken out of the show case by the mob and unloaded.

Although Shipp was in the midst or near the members of the mob for about an hour when they were in the jail, he did not seek to obtain information so that he could identify any of them, and he testifies that he does not know any member of the mob.

Only one conclusion can be drawn from these facts, all of which are clearly established by the evidence—Shipp not only made the work of the mob easy, but in effect aided and abetted it.

Gibson is involved in the same condemnation though under less responsibility. We think belief on his part that a mob would attempt to enter the jail and lynch Johnson on the night of the nineteenth must be presumed.

The day jailer left the jail some time after six o'clock, and transferred the keys to Gibson, the night jailer. Gibson's 15-year old boy was with him, but went to the opera house at 8.30. Gibson was in charge of the jail more than two hours before the arrival of the mob, and he made no effort to summon assistance to repel the attack, although necessarily he must have known that he alone could only offer slight resistance. Mrs. Baker, a white woman, confined on the same floor with Johnson, testified that Gibson, soon after arriving at the jail, when she had gone down stairs to get a letter written, said to her that a mob was coming, and directed her to go to her room, and when the mob was at the jail came to her door and told her that no one would hurt her. Gibson admits the last statement, but denies the first.

He testifies that when he heard the mob he went into the hospital cell, located on the top floor, and sat down on a lounge, and as soon as the mob got upstairs he handed over to them his pistol and the keys, including a key to the door of Johnson's cell; that he did not try to use the pistol, or to resist the mob by force; that from the top floor he could have gone through the kitchen into the yard and back of the jail, but he

made no effort to do so, although it took the mob some ten minutes after he knew they were there to break through the door between the outer door and the jail proper; that he just gave up and made no effort at all to resist the mob or rescue Johnson after they had left the jail; that although the men were bold in their work, he failed to recognize any one excepting Nick Nolan.

Galloway was a deputy sheriff from the time Johnson was convicted until after the lynching, and was told by the sheriff after the mob had left for the bridge to go down there, and did so, but Johnson was then dead. He was criminal court deputy, and served criminal court papers and made arrests. But he had no charge of the jail or keeping of prisoners except when officially so assigned. He had no connection with the jail or the prisoners at any time after Johnson was brought from Knoxville on the tenth or eleventh of March. He testified that he had heard nothing while attending to his duties that made him think Johnson was in danger; was a member of the Eagle Club, and was there on evening of the nineteenth, at 7.45, not having heard prior thereto anything about any impending lynching. His first information of the lynching was after 10 o'clock, when he went to the jail at once. There he met the sheriff, who asked him to go to the bridge, which he did, but Johnson was dead. We think Galloway must be acquitted of the charges in the information.

This brings us to a consideration of the case in respect of the six defendants, who are charged as members of the mob and participants in its action.

As to Williams and Nolan, there is direct testimony to their participation in the lynching, and we do not think that the evidence relied on to weaken that conclusion is sufficient to do so.

As to Padgett and Mayse, there is testimony of statements on their part on the afternoon of the nineteenth and the morning of the twentieth, which, if believed, demonstrates their guilt. We have carefully examined and analyzed the evidence to impeach the principal witness to these conversations, and

also to make out alibis, but we cannot accept it as convincing.

We hold that the case as to Justice and Ward fails on the evidence.

In our opinion it does not admit of question on this record that this lamentable riot was the direct result of opposition to the administration of the law by this court. It was not only in defiance of our mandate, but was understood to be such. The Supreme Court of the United States was called upon to abdicate its functions and decline to enter such orders as the occasion, in its judgment demanded, because of the danger of their defeat by an outbreak of lawless violence. It is plain that what created this mob and led to this lynching was the unwillingless of its members to submit to the delay required for the appeal. The intent to prevent that delay by defeating the hearing of the appeal necessarily follows from the defendants' acts, and if the life of any one in the custody of the law is at the mercy of a mob the administration of justice becomes a mockery. When this court granted a stay of execution on Johnson's application it became its duty to protect him until his case should be disposed of. And when its mandate issued for his protection was defied, punishment of those guilty of such attempt must be awarded.

The rule will be discharged as to the defendants Galloway, Justice and Ward, and made absolute as to the other defendants.

> *Rule discharged as to defendants Galloway, Justice and Ward, and made absolute as to defendants Shipp, Gibson, Williams, Nolan, Padgett and Mayse. Attachments to issue, returnable on Tuesday, June 1.*[1]

MR. JUSTICE MOODY did not hear the argument and took no part in the disposition of the case.

---

[1] For proceedings on the return of the attachment on June 1, see p. 483, *post.*

Mr. Justice Peckham, with whom concurred Mr. Justice White and Mr. Justice McKenna, dissenting.

I dissent from the opinion and judgment of the court in this case, and I think its importance requires a statement of the reasons for my dissent. In regard to the crime which was perpetrated by the mob upon the person of the negro there can be but one opinion. I take it that all intelligent and respectable citizens who are cognizant of the facts agree that it was murder, without one extenuating circumstance to relieve its atrocious character. The important question, however, is, first, as to the sheriff—whether he is guilty of the charge made against him in the information filed in this proceeding. The charge, as contained in the information, upon which such a vast amount of evidence has been taken, is that the sheriff, and many other persons, conspired together for the purpose of breaking and entering the county jail and taking therefrom the negro Johnson, in order to lynch him, with the intent to thereby show their contempt and disregard of the order of this court and to prevent the hearing of the appeal.

A careful consideration of the case leaves me with the conviction that there is not one particle of evidence that any conspiracy had ever been entered into or existed on the part of the sheriff, as charged against him. It is not alone that the evidence preponderates in his favor, but it seems to me there is no material evidence against him, certainly none that rises higher than the merest possible suspicion, founded upon evidence of facts which are in themselves wholly inconclusive, and just as consistent with innocence as with guilt. His character is shown by many witnesses to be that of the highest. Not a man in Chattanooga stands better as a man and a citizen than he does. There is not a particle of evidence to the contrary. He has lived an honored and respected citizen of that city since 1874; has held honorable official positions before the one that he now holds, and yet, as an old man, he is adjudged guilty of a contempt of this court and liable to serve

a disgraceful imprisonment because, as is insisted in this record, he did not do as much towards resisting a lawless mob as this court says he ought to have done.

The crime for which Johnson was convicted was perpetrated on a white schoolgirl on January 23, 1906, and on the twenty-fifth of that month Johnson was arrested near Chattanooga and charged with the crime. After being arrested he was taken by the sheriff, by order of the State Criminal Court, to the jail at Nashville, where he was kept until the day of his trial, February 6. The sheriff was active and intelligent in his efforts to preserve the safety of the negro. No adverse criticism is or can truthfully be made upon his conduct at that time. At the time of the arrest of the negro there is no contradiction in the evidence that there was very great excitement and a disposition evinced to lynch Johnson at once. A crowd of over a thousand, it is said, surrounded the jail on the night of January 25, where Johnson was supposed to be, but the prisoner was not in the jail, and the deputies of the sheriff (the sheriff himself, having Johnson in custody, was taking him to Nashville) exhorted the mob to disperse, and finally people were sent into the jail on behalf of the mob, and went through it to satisfy themselves that Johnson was not there. The mob thereupon dispersed. On January 26 a grand jury was convened and Johnson was indicted, and on February 6 he was brought to Chattanooga from Nashville, and his trial was commenced that day in the criminal court. On February 9 he was convicted and sentenced to death. No appeal was taken by the lawyers appointed by the court to defend him from that sentence. The lawyers said they feared the prisoner would be lynched if such an appeal were taken. On his conviction he was taken from Chattanooga to Knoxville, in the personal custody of the sheriff, to be safe from any possible violence of the mob. No mob, however, appeared, and nothing was attempted. The judge who presided at the trial of the negro, after his conviction, told the sheriff that the prisoner would be entirely safe at Chattanooga. After the

trial the excitement decreased very greatly and seemed to disappear entirely. Of this fact there is no contradiction in the evidence. On March 3 a petition for a writ of *habeas corpus* was filed in the United States Circuit Court for the Northern Division of the Eastern District of Tennessee on the part of Johnson. On March 10 the petition was denied, and the Circuit Judge ordered that Johnson be remanded to the custody of the sheriff of Hamilton County (at Chattanooga), Tenn., to be detained by the sheriff in his custody for ten days, in which to permit Johnson to prosecute an appeal from the order, and in default of the prosecution of such appeal further proceedings to be taken in the state court of Tennessee, under its sentence. Immediately after this decision Johnson was taken back to Chattanooga, arriving there March 11. Everything was quiet and there was no evidence of excitement, nor of any intention whatever to interfere with the negro. The sheriff kept watch of public sentiment for several days thereafter. He was himself going about through the city, mixing with all manner of crowds, and found not the slightest evidence that would lead any reasonable man to believe that any assault was intended upon Johnson. The sheriff stated that he did some canvassing in his election campaign during this time, and was around in the manufacturing establishments and saw no excitement and heard no talk of the case during the whole time. There was nothing at all, says the sheriff, that came to his knowledge during this time that would have put a prudent and careful man on his guard.

On March 19, the day preceding the night of the lynching, the same thing was noticed of a total lack of any evidence of any excitement or of any evidence of an intention to commit any violence. Thus from the eleventh to the nineteenth of March—from the time that Johnson was brought back from Knoxville to Chattanooga, after Judge Clark, the United States judge, had denied his petition for *habeas corpus*—the city was entirely tranquil and nothing was done which would have caused any man, even the most circumspect and pru-

dent, to believe that any violence was intended. ·During the time, from the eleventh to the nineteenth of March, there had been no extra guards at the jail because of these facts. No demonstration had been made against the jail and no threats made against the prisoner that anybody heard. Judge Clark, now deceased, who had been a resident of Chattanooga since 1883, was a witness in this proceeding, and stated that he had never heard anything suggested as to there being any danger to Johnson if the stay of execution were granted in his case. Judge Clark said: "It strikes me it was absolutely absurd in view of what actually occurred." The judge was also asked whether anything said at the trial of the *habeas corpus* proceedings on the part of the representatives of the State, or on the part of any one, caused him to apprehend any mob violence to this man, and the judge said, none in the least. The judge also said that he had asked his secretary on the day that he was at Chattanooga on his way to St. Augustine if he had heard of any suggestions or hints of violence or dissatisfaction with the situation, and the secretary told him that he had not. On March 19, he had, he said, called up some one of the defendants' attorneys and found out that the appeal from the order denying the *habeas corpus* had been allowed by the Supreme Court of the United States, and the judge said to the attorney that he would be there all day at his office and would leave for Florida that night. The judge said the reason he made that announcement was that he had known that Johnson had been taken to another jail prior to this, and that he was brought out of the Knoxville jail when the petition for *habeas corpus* was brought up before him (Judge Clark). "Therefore," Judge Clark said, "on account of that, after getting Mr. Justice Harlan's telegram, I would have ordered the man to any jail where it was desired to send him . . . if it had appeared that the prisoner was in great or real danger—if that had appeared to me—I am quite sure that I would have made the order of my own motion, or would have called up his attorney and suggested that he make an application for

his removal." The following question was also put to the judge: "Q. Judge Clark, I will ask you if the attorney to whom you talked or any other attorney for the defendant Johnson, or any other person, suggested to you the necessity or even the propriety of taking steps to protect your prisoner, the Federal prisoner Johnson? A. I never heard the remotest suggestion, and I did not think the man was in any danger. I thought it was simply the noise that is generally made by people who reall do not expect to do anything. . . . I will say that I had heard no suggestion and that I had no thought that there was any danger on hand anywhere." If there had been any evidence of danger or the possibility thereof, would not the attorneys of the negro who were engaged in the prosecution of their *habeas corpus* proceedings have responded to the judge, and asked for the removal of the negro to another jail? They did not ask for it because, as is perfectly evident, they shared the general opinion that there was no danger; that the former danger had passed, and there was no reason for further action.

The same kind of evidence was given by the most respectable men in the community—editors, reporters, railway agents, large employers of men, clergymen, lawyers, doctors and business men, citizens of the place, and also by the chief of police of the city. Not one of them apprehended danger of mob violence at that time. All of these men were cognizant of the facts as to the prior attempts at lynching and as to the high state of excitement which existed at that time. But they all agreed that such excitement had entirely passed and that there was not the least danger to be apprehended. One of these ministers, the Rev. Mr. Boswell, had been a resident of the city for nearly four years, and was a member of what is termed the Pastors' Union of Chattanooga. He was also a fraternal delegate from the Pastors' Union to the Central Labor League, composed of delegates from every labor organization in the city, and, as a member of the Pastors' Union, he coöperated with the Central Labor League as a fraternal

delegate. He also preached on an average twice a week in the various shops in the city. . He said that at the time of the arrest the public feeling was intense and that it subsided with the beginning of the trial. He was present during most of the trial. After the trial was over he found no talk that would cause him to apprehend that there might be an attempt to lynch the prisoner. He had, he said, preached a sermon on lynching after the first attempt was made and had taken the position that it was a violation of good citizenship, and did not mince his words at all, and yet with all these opportunities to know the state of public feeling he said that there was nothing that would arouse apprehension, on his part, or, so far as he could see, on the part of any prudent man, that there was any lynching threatened. And this, too, after it was known that this court had allowed the appeal from Judge Clark's order. The evidence of the other witnesses was of the same character, and there were unanimous expressions of opinion by the witnesses upon the hearing of this case, that there was no question of danger of mob violence to be apprehended up to the very last moment; and yet counsel for the Government have regarded it as part of the evidence of the guilt of the sheriff as a conspirator that he acted as if he did not apprehend any violence, and that he took no steps to prevent it on the day in question. No one else had any idea that there was any danger and no one else was looking for it. The men who testified that there was no apprehension of mob violence were men who were specially cognizant of the state of public opinion at that time. The counsel for the Government insisted that it was the duty of the sheriff to have had the jail guarded on that day by extra guards, and that his failure to do so was evidence of his being guilty of the conspiracy as alleged in the information. Although the fact was announced in the morning papers of the nineteenth, that the allowance of the appeal had been granted by this court, there was during the day no evidence of excitement and no hostile demonstration or suspicion of it against the prisoner, and no evidence of any fact going to

show any projected formation of a mob or the least probability of any lynching or any attempt that night. Under these circumstances, on March 19 the sheriff went home about half-past six in the evening, leaving things at the jail the same as usual. Suppose, as a matter of judgment, the sheriff should have proceeded as if this almost universal sentiment as to the absence of all danger was erroneous, or not well founded, and that as matter of good sense he should have had the jail guarded, is it possible that he can be properly convicted of contempt while he agreed with this public sentiment and acted accordingly? At any rate, he went home as usual, and was sitting at his desk in his home when the telephone sounded some time about nine o'clock and he recognized, upon going to it, the voice of the Attorney General, Whittaker, who asked him if he knew what was going on at the jail, and the sheriff said, "No," and the Attorney General said, "You had better go down there." He went down there as rapidly as he could, running most of the way and walking rapidly for the rest, and, being under the care of a physician for a difficulty of the stomach, he was much exhausted when he arrived at the jail, where a large number of men were assembled, many of them armed, and they immediately surrounded and took possession of him. Many of them were masked and were waiting for their comrades to bring Johnson down. The sheriff expostulated and remonstrated with these men and asked them to desist, when they seized him. He was seized from behind, and he testified that he did not know but that they were going to do him some violence, and he reached back for his gun, which he had in his pocket. They assured him that they did not intend to hurt him and then they seized and rushed him up the stairs and carried him into a hallway, where he was kept a prisoner until after the crowd had got Johnson and left the jail with him. The sheriff was sixty-three years of age at this time, and, on account of his physical condition, unable in any event to have offered any great resistance. There were at least ten or fifteen of the men around him who were armed, and the

sequel proved that many more in the crowd were also armed. Others were standing back looking on. Whether the sheriff might possibly have been quicker with his gun and taken it out of his pocket and shot some of them, is not certain, from the evidence, but the odds of even ten or fifteen to one are somewhat large, and that he did not kill, or attempt to kill, any of them is no evidence whatever of complicity with these miscreants, and certainly no evidence of contempt of this court. It seems to me most extraordinary that even an official under these circumstances can be found guilty of a contempt because in fact he did not resist to the death.

Argument has also been made against the sheriff, based on the fact that on his way from the house to the jail he did not seek out the militia, a company of which is said to have been engaged in drilling that night in its drill room, and ask for assistance immediately at the jail. It may be that such would have been a wise course, but he was acting on the spur of the moment and under a call to come immediately to the jail, and he was not sure of what was going on, and in seeking the aid of the militia he was not certain to succeed in obtaining immediate assistance. At any rate, the mere fact that he did not think of it or stop to do it is no evidence whatever to show that his failure to seek its aid was criminal. I think the conspiracy part of the information is absolutely without evidence to support it.

It is, however, argued that the sheriff did not otherwise do all that he should have done to prevent this infamous crime, and hence that he is guilty of a contempt. As evidence of this fact the Government refers to the interview of May 28 between the sheriff and a newspaper reporter in Birmingham. On that day, at the time of the interview, news had been received of the action of this court ordering certain persons to show cause as for contempt. In this interview Sheriff Shipp said that the first he knew of the mob was through a telephone message; that he went to the jail and made his way through the crowd, and remonstrated with them against taking any drastic steps

They seized him and took him upstairs, locking him in a bathroom. The members of the mob told him they meant no violence to him. He argued with them against doing anything at all, since the law had so far taken its proper course, and the interview went on with this statement: "I am frank to say that I did not attempt to hurt any of them, and would not have made such an attempt if I could. In the first place, I could have done no good, as I was overwhelmed by numbers." The sheriff's statement that he made no attempt to hurt any of the mob, and would not have made such an attempt if he could, must be taken with the rest of his statement, in which he said that "in the first place, he could have done no good by it, as he was overwhelmed by numbers." There is no doubt of the truth of that statement. He was one man against, at the very least, ten or fifteen or more resolute men, armed and assembled for the purpose of getting this negro, and surrounded by a still larger crowd in the jail yard, and there is not the slightest evidence that they were unarmed. Their subsequent action shows an unnecessary supply of guns. It is true, the sheriff might possibly have drawn his gun and fired at the masked men as he came into the jail and succeeded in killing one and perhaps more of the members of the mob, but it is absolutely true that it would have done no good even then, because with such odds against him his struggles could have resulted only in his being actually overwhelmed and possibly killed, while the negro would not have been saved. The sheriff occupied no vantage ground from which to repel an attack and where his first assailant would stand a good chance of being killed by him. He was not only in the power of the mob who had him in custody, but he was also without any one to appeal to for aid. Those who were bystanders knew of the sheriff's difficulty without further appeal by him, and yet they seemed to feel no desire to interfere or else recognized the uselessness at that time of any effort.

The evidence of witnesses for the Government showed without contradiction that the sheriff came to the jail running as

fast as he could; that he pushed through the crowd, shoved
the men aside and entered the inside of the enclosure, never
stopping at all, and the moment he arrived at the jail door he
was set upon and seized by four or five men and overpowered,
and he talked to and expostulated with the crowd, trying to
reason with them and to get them to stop.  When asked if the
sheriff made any show of force, the Government witness said,
"Well, he didn't have any chance to," and the question being
repeated, the witness said, "Well, he did, yes, but he was over-
powered," that " he resisted their efforts to hold him," by "try-
ing to pull away."   (Evidence of Curtis, one of the reporters
on The Chattanooga Times, and a witness for the Government.)
The evidence of another reporter, Mr. Chivington, and a Gov-
ernment witness, was to the same effect, that the sheriff was
seized by four or five men and overpowered, and carried up-
stairs, and that he appealed to the mob not to lynch the negro.
The witness also said that at this time, just as the sheriff was
seized, the witness imagined he saw the sheriff "like he was
going to draw a pistol, but before he could move any further
there were five or six fellows grabbed him and carried him
bodily to the top of the stairs."

All this time there was not an offer from a single man to aid
the sheriff when they saw him seized, nor did any of them
spread any alarm or ask for any outside aid, and the sheriff
says he did not ask for it because he knew it would be useless
to make any such appeal to the persons there, and that every
one there knew the situation, and the overwhelming numbers
of the crowd surrounding the premises and in the jail.

Of course, as the witnesses heard the sheriff expostulating
with and begging the crowd to do no harm to the negro, if
there had been the least disposition on the part of any one to
come to his aid the opportunity to do so was quite open and
plain.

The appearance of the sheriff after the taking of the negro,
and the effect of the whole occurrence upon him is stated in
the evidence, about which there is not the slightest contradic-

tion. He was greatly excited, and almost in a faint. He was
as white as a sheet, and said to the witness, "My God! I did
everything I could." He also said in the course of the inter-
view with the witness, "'My God! they have ruined me.' He
had all the appearance of a man who was ready to collapse.
You could barely understand what he said. His voice was in
a tremble, like a voice filled with emotion." This is the evi-
dence of Mr. Horan, and it is nowhere contradicted. And yet
the Government claims that in such a case the sheriff should
be imprisoned for a contempt of this court because he did not
do more in the way of resistance to an overwhelming force, and
did not foresee with more clearness than any one else what was
to happen on the night of the nineteenth, and take measures
accordingly to guard the safety of the negro. It seems to me
that the opinion of the court is founded upon this view.

Then, again, this is not a question as to whether possibly the
sheriff might have done more than he did. Some men, under
such circumstances, might perhaps have earlier attempted to
draw their guns, and would possibly only have ceased resist-
ance with their lives. But when one is really overpowered,
superior force makes efforts at resistance futile, if not foolish.
Other men might do less than this man did and still be abso-
lutely innocent of a contempt. The question is not whether
this invalid old man did everything that he possibly could have
done up to the last extremity and at the risk of his life in the
performance of his duty as sheriff. To be free from any con-
tempt of this court it was not necessary that the sheriff should
have stood by the prisoner at the peril of his own life or that
he should have sacrificed it in an unsuccessful attempt against
overwhelming odds to prevent the mob from taking the pris-
oner out of his custody. The sheriff, under circumstances such
as are detailed in this case, should be freed from the charge of
contempt if he were not guilty of any conspiracy with others
to lynch the prisoner, and if he honestly and fairly did what
he could in the way of remonstrance and exhortation to pre-
vent the lynching. Being in the power of the mob, he was not

called upon to sacrifice his life in a desperate and hopeless attempt to save his prisoner against odds, such as appeared in this case, or else take the risk of being adjudged guilty of a contempt of court.  But what could the sheriff have done more than he did do?  That he was in the power of these men is absolutely without contradiction from the evidence.  If he had had his pockets full of pistols he could have done nothing with them, as the evidence shows, the moment he was seized by the crowd.  His statement that the mob took action because of the allowance of the writ of error by this court, which they thought might involve great delay, and that the mob would not stand for that, is but the expression of an opinion by the sheriff as to the reason for the lynching.  He does not and did not pretend to justify the action.  In all probability that was the reason—a dislike of the interference of this court—a reason utterly without justification and disgraceful to those who entertained it.  But the sheriff surely cannot be properly convicted because he simply truthfully stated the sentiments which in his judgment actuated the mob.  It is not a crime to entertain an opinion as to what moved a mob under these circumstances nor can this court properly, in my judgment, convict an official of contempt because he stated his belief that the mob acted from this most disgraceful reason.  Nor is the opinion, as expressed, the least evidence of the guilt of the sheriff of the contempt with which he is charged, or of any conspiracy to commit it.

In the interview the sheriff also said he had looked for no trouble that night, and on the contrary did not look for it until the next day.  It will be remembered the next day was the one appointed for carrying into execution the sentence of the state court, and when the day should pass without the sentence being carried into execution the sheriff said afterwards that he apprehended there might be trouble.  But that was the next day, and the trouble apprehended would be founded upon the happening of that day, and there was an abundance of time in which to prepare for what might then be attempted.  What-

ever the sheriff may have thought of the delay which might be caused by the appeal to this court, or however ill-founded his opinion as to the probable length of that delay, his thoughts on the subject furnish no evidence even tending to show that he conspired with the mob or that he would not do what he could to protect his prisoner when the exigency arose and the time for action arrived. He may have thought there would be great delay, and for that reason did not wonder the people would hate to submit to it. All this, however, is mere evidence as to what it was supposed a mob might do the next day, but is, as I have repeated already, no evidence of conspiracy on the part of the sheriff to aid the mob, and none that he was guilty of a contempt in not resisting or attacking it up to the point of imperilling his life in a futile attempt to protect his prisoner. It seems to me that the sheriff is being held to a degree of responsibility far beyond any reasonable limit, and not justified by the evidence contained in the record.

The Government based its argument for a conviction of the sheriff very largely upon the interview above referred to, and which I have commented on at some length. Strike that out and there is really nothing whatever on which to base the shadow of a claim for a conviction. For the reasons given I think the interview itself is wholly insufficient as evidence of the guilt of the sheriff, and I think the rule to show cause should be discharged as to him. I also think the evidence is too slight upon which to convict the jailer.

I am authorized to say that MR. JUSTICE WHITE and MR. JUSTICE McKENNA concur in this dissent.

For proceedings on June 1, under the order of the court, see page 483, *post.*

APPENDIX TO UNITED STATES *v.* SHIPP.

On May 28, 1906, the Attorney General moved for leave to file an information for contempt and on the same day the following order was made.

UNITED STATES OF AMERICA,
                    COMPLAINANT, } October Term, 1905.
          *v.*
JOHN F. SHIPP *et al.*

On motion of *Mr. Attorney General Moody,* of counsel for complainants, leave is hereby granted to file an information for contempt herein.

The information referred to on the motion of the Attorney General and in the order is as follows:

In the Supreme Court of the United States.

THE UNITED STATES OF AMERICA,
          complainants,
                    *v.*
JOHN F. SHIPP, FRANK JONES, Matthew Galloway, C. A. Baker, T. B. Taylor, Fred Frauley, George Brown, Jeremiah Gibson, Marion Perkins, Joseph Clark, "Nick" Nolan, "Sheenie" Warner, Luther Williams, Paul Pool, William Marquette, William Beeler, Claude Powell, Charles J. Powell, "Bart" Justice, John Jones, A. J. Cartwright, R. F. Cartwright, Henry Padgett, William May, Frank Ward, John Varnell, and Alfred Hammond, defendants. } October Term, 1905. No. 26.[1]
                    Original

*Information.*

*To the honorable the Chief Justice and the Associate Justices of the Supreme Court of the United States:*

Now come the United States of America by William H. Moody, their Attorney-General, and in their behalf inform the court as follows:

_____

[1] October Term, 1906, No. 12, original; October Term, 1907, No. 5, original; October Term, 1908, No. 5, original.

1. That on the 11th day of February, 1906, one Ed Johnson, a citizen of the United States and a resident and citizen of the State of Tennessee, and a colored person of African descent, was convicted of the crime of rape in the criminal court of Hamilton County, held at the city of Chattanooga, in the State of Tennessee, and said court thereupon sentenced the said Ed Johnson to suffer the penalty of death.

2. That thereafter, to wit, on the 3d day of March, 1906, and before the date set for the execution of the said Ed Johnson, a petition for a writ of habeas corpus, signed by the said Ed Johnson, as petitioner, was duly presented to the United States Circuit Court for the Northern Division of the Eastern District of Tennessee, in which it was alleged, among other things, that upon the trial of the said Ed Johnson in the criminal court of Hamilton County in the State of Tennessee for the crime of rape, for which he had been convicted, said petitioner had been denied a trial by a fair and impartial jury, and had been denied the aid of counsel in violation of the fifth and sixth amendments to the Federal Constitution, and that said petitioner was also denied rights secured to him under the fourteenth amendment to the Federal Constitution; that thereafter, to wit, on the 10th day of March, 1906, the application of the said Ed Johnson for a writ of habeas corpus came on for hearing before the said United States Court for the Eastern District of Tennessee upon the petition, return, answer, and replication, and upon the testimony of witnesses given orally in open court, and after argument of counsel, the said Circuit Court ordered that said petition be dismissed, and that the writ of habeas corpus prayed for in said petition be denied. It was further ordered by the said Circuit Court of the United States that said petitioner be remanded to the custody of the sheriff of said Hamilton County in the said State of Tennessee, to be detained by said sheriff in his custody for the period of ten days in which to enable said petitioner to prosecute an appeal from said order, should he be so advised and should an appeal lie from said order, and in default of the prosecution of an appeal within said time to be then further proceeded with by the court of the State of Tennessee under its sentence; that thereafter, to wit, on the 17th day of March, 1906, an application was duly presented by the said Ed Johnson to the Hon. John M. Harlan, an associate justice of the Supreme Court of the United States, assigned to the Sixth Circuit, asking that an appeal be allowed to the Supreme Court of the United States from the judgment rendered in the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee on March 10, 1906, denying his, the said Ed Johnson's, application for a writ of habeas corpus, as aforesaid, which said appeal was on the same

day duly allowed by Mr. Justice Harlan; that thereafter, to wit, on the 19th day of March, 1906, a motion was duly made in the Supreme Court of the United States by Mr. E. M. Hewlett, counsel for and representing the said Ed Johnson, for an order allowing an appeal to the Supreme Court of the United States from the judgment of the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee, rendered on the 10th day of March, 1906, denying his, the said Ed Johnson's, application for a writ of habeas corpus, which motion was thereupon granted by the Supreme Court of the United States and an order duly made and entered by the Chief Justice in the words and figures following, to wit:

"Ed Johnson, Appellant, v. The State of Tennessee.

"On motion of Mr. E. M. Hewlett, of counsel for the appellant, it is ordered by the court that an appeal from the Circuit Court of the United States for the Eastern District of Tennessee be, and the same is hereby, allowed, and that all proceedings against the appellant be stayed, and the custody of the said appellant be retained pending this appeal.

"Per Mr. Chief Justice Fuller."

All of which more fully appears from the record in the case entitled "Ed Johnson, Appellant, v. The State of Tennessee," on file in the office of the clerk of this court.

3. This honorable court is further informed of the following facts, which are alleged and stated by the Attorney-General solely upon information and belief:

That on the same day, to wit, the said 19th day of March, 1906, and after the making and entering of said order, as aforesaid, the clerk of the Supreme Court of the United States duly notified by telegraph John F. Shipp, the sheriff of said Hamilton County, in the State of Tennessee, of the making and entering said order, as aforesaid, and of the contents thereof, to wit, that all proceedings against the said Ed Johnson were ordered stayed by the said Supreme Court and that the custody of the said Ed Johnson by the said John F. Shipp, as sheriff of said Hamilton County, should be retained by him, the said John F. Shipp, pending the determination of said appeal in the Supreme Court; that said telegram informing the said John F. Shipp of the action of this honorable court was received by said sheriff before 6 o'clock on the evening of the said 19th day of March, 1906; that in addition to the notification by telegraph of the action of this court in allowing said appeal and staying proceedings against the said Ed Johnson, as aforesaid, there was published and circulated in the said city of Chattanooga

in the evening papers on the said 19th day of March, 1906, a full ac-count of the action of the Supreme Court of the United States in allow-ing an appeal and granting a stay of further proceedings on the part of the state courts against the said Ed Johnson until the determination of said appeal before the Supreme Court of the United States.

4. That during all the times herein mentioned the above-named defendant, John F. Shipp, was the duly elected, qualified, and acting sheriff of Hamilton County, in the State of Tennessee, and as such sheriff had and exercised full charge and control of the county jail, located in the city of Chattanooga, in said county, and was the legal custodian under the laws of Tennessee of all persons duly committed in said county under the laws of said State to confinement and im-prisonment within said jail; that the above-named defendants, Frank Jones, Matthew Galloway, C. A. Baker, T. B. Taylor, Fred Frauley, George Brown, Jeremiah Gibson, Marion Perkins, and Joseph Clark, and each of them, were, during all the times herein mentioned, the duly appointed, qualified, and acting deputy sheriffs of said county and State; that said sheriff and said deputy sheriffs and each of them before the hour of 6 o'clock on the evening of the said 19th day of March, 1906, were fully advised and informed of the action taken by the Supreme Court of the United States with respect to the appeal of the said Ed Johnson, as hereinbefore set forth; that the said Ed Johnson was then and there a prisoner confined and restrained of his liberty in the said county jail and in the lawful custody and control of said sheriff and said deputy sheriffs under a commitment duly issued out of the criminal court of said Hamilton County, and under and pur-suant to the orders of the said United States Circuit Court for the Northern Division of the Eastern District of Tennessee and the Su-preme Court of the United States made and entered as aforesaid; that said sheriff and said deputy sheriffs on the said 19th day of March, 1906, after having been advised of the action of the Supreme Court of the United States, as aforesaid, were informed, and had every reason to believe, from current reports and rumors conveyed to them and each of them, that an attempt would be made on the evening of said day or early in the morning of the following day, by a mob composed of a large number of armed men, to force an entrance into the said county jail for the purpose of taking therefrom by violence and unlawful means the said Ed Johnson and putting him to death; that notwithstanding said rumors and said reports which were conveyed to said sheriff and his said deputies, as aforesaid, the said sheriff withdrew from said jail early in the evening of said day the usual and customary guard and left in charge thereof only the night jailor, to wit, Deputy Sheriff

Jeremiah Gibson, and committed other acts and did other things, evincing a purpose and disposition on the part of said sheriff to render it less difficult and less dangerous for said mob to prosecute and carry into effect its unlawful design and purpose, to wit, the lynching of the said Ed Johnson, designed and planned as aforesaid.

5. That thereafter, to wit, at about the hour of 9 o'clock on the evening of the said 19th day of March, 1906, at the city of Chattanooga in the said county and State, the above-named defendants, John F. Shipp, Frank Jones, Matthew Galloway, C. A. Baker, T. B. Taylor, Fred Frauley, George Brown, Jeremiah Gibson, Marion Perkins, Joseph Clark, "Nick" Nolan (whose true first name is to complainants unknown), "Sheenie" Warner (whose true first name is to complainants unknown), Luther Williams, Paul Pool, William Marquette, William Beeler, Claude Powell, Charles J. Powell, "Bart" Justice (whose true first name is to complainants unknown), John Jones, A. J. Cartwright, R. F. Cartwright, Henry Padgett, William May, Frank Ward, John Varnell, and Alfred Hammond, and each of them, and a large number of other persons whose names are to complainants unknown, did then and there willfully, unlawfully, and wrongfully combine, conspire, confederate, and agree to break and enter the said county jail of Hamilton County for the purpose of taking therefrom the person of the said Ed Johnson to lynch and murder him, the said Ed Johnson, with the intent then and there had and entertained by the said defendants, and each of them, to show their contempt and disregard for the order of this honorable court made, entered, issued, and published, as aforesaid, and for the purpose of preventing this honorable court from hearing the appeal of the said Ed Johnson, allowed by this court, as aforesaid, and for the purpose of preventing the said Ed Johnson from exercising and enjoying a right secured to him by the Constitution and laws of the United States; that in the prosecution and futherance of said unlawful conspiracy, made and entered into as aforesaid, and in order to show their contempt and disregard for the said order of this honorable court, and in order to prevent this court from hearing said appeal, said defendants and each of them did then and there do the things and commit the acts more particularily described, as follows, to wit:

That between the hours of 9 and 12 o'clock on the evening of the said 19th day of March, 1906, at the city of Chattanooga, in the county and State aforesaid, a large number of persons, including the above-named defendants, with the exception of the said John F. Shipp, the sheriff of said county, and the said Jeremiah Gibson, deputy sheriff of said county, assembled in the vicinity of said county jail, and thereupon

said mob unlawfully and wrongfully entered said jail and with force and arms broke open the cell in which the said Ed Johnson was then and there confined as a prisoner, and with force and violence and against the will of him, the said Ed Johnson, took him, the said Ed Johnson, from said jail to a point a short distance therefrom and hanged him, the said Ed Johnson, by the neck until he was dead; that at the time said mob entered said jail, as aforesaid, the only person in charge thereof was the said deputy sheriff, Jeremiah Gibson; that while the mob was in possession of said jail the said sheriff, John F. Shipp, arrived at said jail, but made no effort to prevent said mob or any of the members thereof from taking the said Ed Johnson from said jail; that the said John F. Shipp and the said Jeremiah Gibson were in truth and in fact in sympathy with said mob and, while pretending to perform their duty as officials of said county and State in affording protection to the said Ed Johnson, who was then and there in their lawful custody and control, the said John F. Shipp and the said Jeremiah Gibson and each of them did in truth and in fact aid and abet said mob and the members thereof in the prosecution and performance of their unlawful act in lynching and murdering the said Ed Johnson, as aforesaid; that during all this time the above-named defendants and each of them, and the said John F. Shipp and the said Jeremiah Gibson and each of them then and there well knew that the Supreme Court of the United States had made, entered, issued and published the order in the manner hereinbefore set forth; that all of said acts were then and there committed by said defendants and each of them, and the other members of said mob whose names are to complainants unknown, with the intent then and there had and entertained by them and by each of them to show their contempt and utter disregard for the order of this honorable court made and entered as aforesaid, and in order to prevent this honorable court from hearing the appeal of the said Ed Johnson, which appeal had been perfected and allowed, as aforesaid.

6. Wherefore, the United States of America, the complainants herein, through their Attorney-General, respectfully request this honorable court that in consideration of the acts committed by the above-named defendants and each of them, as hereinbefore set forth, it will issue and direct the marshal of this court to serve upon said defendants and each of them a rule to show cause, if any there be, on a day certain why said defendants and each of them should not be punished as and for a contempt of this honorable court.

WILLIAM H. MOODY,
*The Attorney-General of the United States.*

WASHINGTON, D. C., *May 25th,* 1906.

On May 28, 1906, rule to show cause was entered as follows:

Supreme Court of the United States.

THE UNITED STATES OF AMERICA,
     COMPLAINANTS,  } October Term, 1905.
    *v.*  No. 26. Original.
JOHN F. SHIPP AND OTHERS.

On consideration of the information filed herein,

It is now here ordered by the court that cause be shown by the above-named defendants and each of them before this court, at the city of Washington, on Monday, October 15th, 1906, at twelve o'clock noon of that day, or as soon thereafter as counsel can be heard, why they and each of them should not be punished as and for a contempt of this court.

And October 15, 1906, the marshal of the Supreme Court of the United States made the following return:

Came to hand at my office the 4th day of June, A. D. 1906, and for the purpose of serving the same, I, J. M. Wright, marshal of the Supreme Court of the United States, do hereby authorize and deputize William A. Dunlap, United States marshal for the Eastern District of Tennessee, or any of his deputies, to serve the within rule to show cause on the parties named therein, and make due return thereof.

In testimony whereof I hereunto subscribe my name, at the city of Washington, this 4th day of June, A. D. 1906.

       J. M. WRIGHT,
   *Marshal of the Supreme Court of the United States.*

Came to hand at my office in Knoxville, Tenn., this the 7th day of June, 1906, and executed on the following named defendants, at time and place set opposite their names, by summoning them to appear before the United States Supreme Court in the city of Washington, D. C., on Monday, the 15th day of October, 1906, at 12 o'clock noon, and by leaving a copy of this writ with each of the said named defendants, to wit:

Joseph F. Shipp (sheriff), Chattanooga, June 8th, 1906. Dunlap, marshal.

Frank Jones (deputy sheriff), Chattanooga, June 8th, 1906. Dunlap, marshal.

Mathew Gallaway (deputy sheriff), Chattanooga, June 9th, 1906. Welch, D. M.

C. A. Baker (deputy sheriff), Chattanooga, June 9th, 1906.

T. B. Taylor (dept. sheriff), Chattanooga, June 8th. Dunlap, U. S. M., at Chattanooga.

Fred Frauley (dept. sheriff), June 8th. Dunlap, U. S. M., at Chattanooga.

Geo. Brown (dept. sheriff), June 9th. Gresham, D. M., at Chattanooga.

Jeremiah Gibson (dept. sheriff), June 9th. Gresham, D. M., at Chattanooga.

Marion Perkins (dept. sheriff), June 8th. Dunlap, U. S. M., at Chattanooga.

Jas. Clark (dept. sheriff), June 9th. Gresham, D. M., at Chattanooga.

Nick Nolan, June 8th. Welch, D. M., at Chattanooga.

"Cheeney" Warner, June 8th. Dunlap, U. S. M., at Chattanooga.

Luther Williams, June 8th. Dunlap, U. S. M., at Chattanooga.

Wm. Marquet, June 8th. Dunlap, U. S. M., at Chattanooga.

Wm. Beeler, June 8th. Dunlap, U. S. M., at Chattanooga.

Claud Powell, June 9th. Welch, D. M., at Chattanooga.

Chas. H. Powell, June 9th. Welch, D. M., at Chattanooga.

Bart Justice, June 8th. Dunlap U. S. M., at Chattanooga.

Johnnie Jones, June 9th. Welch, D. M., at Chattanooga.

A. J. Cartwright, June 8th. Welch, D. M., at Chattanooga.

R. T. Cartwright, June 8th. Welch, D. M., at Chattanooga.

Henry Padgett, June 8th. Welch, D. M., at Chattanooga.

Wm. May, June 9th. Welch, D. M., at Chattanooga.

Frank Ward, June 8th. Welch, D. M., at Chattanooga.

John Varnell, June 8th. Dunlap, U. S. M., at Chattanooga.

Alford Handman, June 9th. Gresham, D. M., at Chattanooga.

The defendant Paul Pool not to be found in my district; said to be in Mobile, Ala.

This July 26th, 1906.

(Signed)        W. A. DUNLAP,
*U. S. Marshal, E. Dist. of Tennessee.*

[Similar authorizations for service of defendant Paul Pool by the United States marshals for the Southern District of Alabama, Western District of Texas, Southern District of California and returns by them of "not found."]

Came to my hand, as aforesaid and returned executed by service on

all defendants except Paul Pool, who, after diligent search, as shown by certificates herewith could not be found.

Witness my hand and seal this 15th day of October, A. D. 1906.

J. M. WRIGHT,
*Marshal Supreme Court of the United States.*

On October 15, 1906, leave was granted on application of counsel to file answers of the defendants.

Certain of the answers are as follows:

Joint answer of Joseph F. Shipp, sheriff, and the deputy sheriffs, Frank Jones,[1] Matt. L. Galloway,[1] C. A. Baker,[1] Thomas B. Taylor,[1] George W. Brown,[1] Jeremiah Gibson, Fred Frauley,[1] Marion Perkins [1] and Joseph C. Clark.[1]

*Judson Harmon,*
*Clift and Cooke,* } Attorneys.
*Robert Pritchard,*

*To the honorable the Chief Justice and the Associate Justices of the Supreme Court of the United States:*

Now come Joseph F. Shipp, Frank Jones, Matthew Galloway, C. A. Baker, T. D. Taylor, Fred Frauley, George Brown, Jeremiah Gibson, Marion Perkins, and Joseph Clark, defendants, and, admitting their official characters as alleged in the information herein, but protesting that they have each and all never nor in anywise been lacking in obedience to the authority and respect for the dignity of this honorable court, for cause why the prayer of said information should not be granted as against them respectfully show:

## I.

They first respectfully submit whether they or any of them ought to be interrupted in the discharge of their duties under the laws of Tennessee and put to trouble and expense by being required to answer before this honorable court the charges made against them in the information, because they are advised and believe, and so aver, that said charges, even if true, would be, and ought to be treated as, crimes under the laws of Tennessee and contempt of the judicial authority thereof only, and not offenses against the authority or dignity of this

---

[1] The rule to show cause was subsequently discharged as to these defendants.

honorable court, by reason of the following acts which are each and all established by the record herein:

The petition filed in the Circuit Court of the United States by Ed. Johnson for a writ of habeas corpus, mentioned in the information and, with the complete record of the proceedings thereon, made part of said information by reference, did not in any way or in any respect whatever allege a lack of jurisdiction in the court of the State of Tennessee in which said Johnson was convicted, either to try him on said charge or to adjudge the sentence imposed on him under which he was in custody of said Shipp, as sheriff, as stated in the information.

It is not averred in said petition that the alleged denials of rights secured to said Johnson by the Constitution of the United States, or any one of such denials, were made by virtue or under color of the constitution, laws, or rules of judicial practice of the State of Tennessee. On the contrary it appears from said petition that each and every of such alleged denials of right was and is charged as being due to the individual action of officials and other citizens of said State in violation of their duties under the constitution and laws thereof.

And these defendants are advised and believe, and so aver, that according to the repeated and uniform decisions of this honorable court the Circuit Court of the United States, in which said petition for habeas corpus was filed, had no right or authority whatever to inquire into any of the matters alleged therein, but that the same were cognizable only by the Supreme Court of Tennessee, which, as shown by the record herein, had full power and authority under the constitution and laws of said State, properly to deal with and dispose of each and every complaint made in said petition with reference to the indictment, trial, and sentence of said Johnson. So that said petition for a writ of habeas corpus was, on the face thereof, merely an attempt on the part of said Johnson to obtain from the Circuit Court of the United States instead of from the Supreme Court of Tennessee a review of said proceedings for alleged errors therein.

Said record, which contains all the evidence offered by either party in said Circuit Court of the United States, shows that each and all the allegations of said petition for a writ of habeas corpus concerning the denial of rights to said Johnson by said criminal court of Tennessee, were both false and unfounded.

There was no proof whatever that he was denied the aid of counsel; on the contrary it appears that, as he was unable to employ counsel, said criminal court appointed three lawyers of high standing to conduct his defense, and that they did so, as he himself admits, with ability, fidelity, and zeal.

There was no proof whatever that said Johnson ever made or had any ground for objection to the selection or character of the juries which indicted and tried him, or of either of them. On the contrary it appears that his counsel forbore to make such objection on learning the facts.

There was no proof whatever that his attorneys were denied the right to apply for a change of venue or a continuance. On the contrary, it appears that they forbore to make application therefor, and that the time for said trial, as originally fixed by the court, was postponed by the consent of counsel for both parties; and that the trial was had at the time so agreed on.

There was no evidence whatever that his trial was not public, or that any of his relatives or friends were prevented from attending the same. On the contrary the proof shows that precautions were merely taken, at the request of his own counsel, to prevent the attendance of disorderly persons only; that such precautions were withdrawn when the first day of the trial showed them to be needless, and that during each and all of the three days the trial lasted there was a large attendance of the public.

There was no proof whatever that he was compelled to give evidence against himself. On the contrary, it appears that he rose, without any objection by himself or his counsel, when requested by a juror, in order to afford the girl he was charged with assaulting a better view; and that the exclamation of a juror, which occurred after the testimony had all been given, was treated by all, including the prisoner and his counsel, as the effect of the proof on an emotional nature, not as evidence that the juror was not impartial when accepted and sworn, and consequently nothing was said or done by the prisoner's counsel with reference to such occurrence, although they had full opportunity.

There was no proof whatever that when new counsel took up his case after his conviction they were denied the right to file a motion for a new trial, or to present a bill of exceptions, or to appeal to the Supreme Court of Tennessee. On the contrary, it appears that no motion for a new trial was presented until after the time allowed for such motions by the reasonable and long-established rules and practice of the court had expired, although said counsel had ample time to prepare and file the same before such expiration; and that said counsel took no steps whatever towards preparing or presenting a bill of exceptions or taking an appeal, although the court remained in session for an entire week after the conviction of said Johnson and for five consecutive days after said counsel first appeared.

By reason of the foregoing facts appearing undisputed on the

record herein, these defendants are advised and believe, and so aver, that said petition for a writ of habeas corpus was not an appeal in good faith to the power and authority vested by the Constitution and laws of the United States in said Circuit Court; that said Circuit Court of the United States had no right or authority to entertain said petition and thereby interfere with the proceedings had and taken by the judicial authority of the State of Tennessee; and that consequently the order of said Circuit Court dismissing said petition was not appealable to this honorable court under the decisions and rules of practice thereof and the Constitution and laws of the United States.

They, therefore, humbly pray the consideration and judgment of the court in the premises and that said information be dismissed as against them.

## II.

If and in case the court shall find and decide the foregoing cause shown to be insufficient, then these defendants, as further cause why they and each of them should not be punished as for contempt of this honorable court, as prayed in said information, severally and collectively plead and say, that the charges made against them and each of them respectively in said information are not true, and to each and every of said charges, that they are not guilty.

Wherefore these defendants each and all most humbly pray that the rule herein issued against them be discharged.

The separate answer of defendant Nick Nolan by *Lewis Shepherd, Fleming & Shepherd*, attorneys, contained averments as follows:

He denies that he had any connection with or had anything to do with the mob which attacked the jail of Hamilton County, Tennessee, on the evening and night of the 19th day of March, 1906, when Ed. Johnson was taken from jail and lynched. This defendant had no knowledge or information whatever by rumor or otherwise that a mob was to be formed or was forming to lynch and murder said Ed. Johnson.

He did not at any time combine, conspire, confederate, or agree with the persons named in said information or any or either of them, or with any other person or persons to break and enter the jail of Hamilton County for the purpose of taking therefrom the person of Ed. Johnson to lynch and murder him. He did not participate with

the mob that broke the jail or with the mob which lynched and murdered said Ed. Johnson.  He did not know beforehand that a mob was to be formed to lynch said Ed. Johnson, and he did not in anyway aid, abet, counsel, or advise the lynching of said Ed. Johnson, and did not know anything about the formation of the mob or its work until after the affair was over, and did not approve the action of the mob in lynching and murdering the said Ed. Johnson.

Defendant was informed after Johnson was hanged that the mob attacked the jail at or about the hour of nine o'clock p. m., March 19, 1906.

At that time the defendant was at his place of business on Whiteside street, in South Chattanooga, about two miles from the Hamilton County jail.  About 9.30 o'clock p. m. of said date he left his place of business and went to the saloon of John Nolan, in South Chattanooga, on Whiteside street.  He remained at this saloon until 10 o'clock p. m., at which time the saloon was closed in pursuance of an ordinance of the city of Chattanooga requiring all saloons to close at 10 o'clock p. m.  After the said saloon closed, defendant remained there or thereabouts with the proprietor, John Nolan, discussing a question of politics until about 10.30 o'clock p. m., at which time he went to his home on Aiken street, in South Chattanooga, where he remained until next morning.

This defendant denies that he ever at any time did any act to show contempt and disregard for the order of this honorable court or to prevent this court from hearing the appeal of the said Ed Johnson. He has always entertained the very highest respect for this honorable court.

The answers of the defendants Henry Padgett and William Mayse, against whom the rule was made absolute, and of defendants Claude Powell, Charles J. Powell, Bart Justice, John Jones, John Varnell and Alfred Handman, as to whom the rule was discharged, by the same attorneys, were similar in form *mutatis mutandi* as to the allegations as to the whereabouts of each defendant respectively.

⌐ The answer of the defendant Paul Werner, *W. H. Cummings* and *G. W. Chamlee*, attorneys, as to whom the rule was subsequently discharged, denied participation and alleged absence from the place where Ed Johnson was lynched.

The answer of defendant Luther Williams, *W. H. Cummings* and *G. W. Chamlee*, attorneys.

1st. That he is advised that the Supreme Court of the United States of America had no jurisdiction of the cause of *Ed Johnson, Complainant*, v. *The State of Tennessee*, and that all proceedings had by the United States Supreme Court in the matter of *Ed Johnson, Complainant*, v. *The State of Tennessee* were null and void and illegal.

2d. That the original petition for a writ of habeas corpus that was sued out by the said Ed Johnson, complainant, against the State of Tennessee was, as this respondent is advised, addressed to the United States District Court at Chattanooga, Tennessee, and that the original proceedings were presented and tried before the Hon. C. D. Clark, judge of the United States court, not at Chattanooga, Tennessee, but at Knoxville, Tennessee, at chambers, and he is advised that from the dismissal of said petition for the writ of habeas corpus held at chambers that there is no appeal and that the appeal that the said Ed Johnson undertook to perfect was, in law, ineffective and that this honorable court did not acquire jurisdiction of the case, because a transcript was presented and filed in this honorable court.

3d. He is advised that Ed Johnson was not a United States prisoner, but that he was a state prisoner, and under the charge of state officials, and that in order to make him a United States prisoner a different proceeding than that which was had in this cause would be required to make said proceedings valid under the law.

4th. That if Ed Johnson was, as a matter of law, a United States prisoner at the time that he was lynched, that no notice of that fact had ever been conveyed to this respondent by any person whomsoever.

5th. That under the law of the United States and the facts of this case he is advised that this honorable court had no jurisdiction to proceed with said cause of *Ed Johnson, Appellant*, v. *The State of Tennessee*, under the facts as alleged in Johnson's petition, and that the case would, upon motion or demurrer, had to have been dismissed or stricken from the docket according to the rule laid down in the case of *Caleb Powers* v. *The Commonwealth of Kentucky*.

6th. Not waiving any of his rights as stated in the foregoing pleas for want of jurisdiction by this honorable court in this case, but pleading and relying upon the same as a full and complete defense to this case, this defendant, Luther Williams, now comes and for further answer to the rule in this cause, and answering so much and such parts of said information as he is informed is material and proper for him to answer, says:

That he was not an officer and that he did not have Ed Johnson in his charge, care, or custody at any time or place whatsoever.

He says that he is a business man and runs a saloon at No. 630 Market street, in the city of Chattanooga, Tennessee, and that his place of business is on the east side of Market street, between Sixth street and Seventh street; and that the county jail of Hamilton County, Tennessee, is on the west side of Walnut street, between Sixth and Seventh streets, and that between the county jail and his place of business there is one cross street.

He further says that the first notice that he had of a mob intending to assemble at the jail or were assembling at the jail in Chattanooga on the night of March 19, 1906, was that about 9.30 to 10 o'clock p. m., some one came in his saloon and called attention of those present there that a mob had assembled at the county jail for the purpose of lynching a negro. Inquiry being made, it developed that it was Ed Johnson.

Under a law of the city of Chattanooga, all saloons were required to close at ten o'clock p. m. every night except Saturday night, and then at 11 o'clock on Saturday night. March 19, 1906, was on Monday night, as affiant now remembers, and it was nearly closing time when he received his first information about a mob at the county jail. He knew that if trouble was about to occur in that neighborhood that all saloons ought to close in order to prevent members of the mob becoming intoxicated and committing violence, and for this reason he immediately closed his saloon and in a few minutes went up to the county jail, which was a distance of about 200 yards, and when he got there a mob was in control of the jail. A large crowd of men had their faces covered and were disguised so that no one could tell who they were and were proceeding to break down the doors of the jail, and in a very short time after his arrival Johnson was taken out and carried to the county bridge and lynched.

This respondent saw the lynching; was on the bridge where he could witness the entire trouble as a spectator with hundreds of other people who were on the bridge at the time.

He is well known to a number of people who were at his saloon on the night that Johnson was lynched and who were about the county jail as spectators at the time, and he was not disguised; made no effort to conceal his own identity; he had no part whatever in aiding or counseling the mob to lynch Ed Johnson and had nothing in the world to do with the entire trouble. Just like people go to see a great fire or anything else of excitement that is about to happen, he went up to the jail to see what the mob was doing and what was going to happen to Johnson.

He denies that he was a member of said mob or that he had anything to do either by word or action, aiding, or abetting in the alleged lynching, or that he counseled or conspired or confederated with any person or persons whomsoever to lynch the said Ed Johnson.

He denies that he endeavored or conspired or confederated or agreed together or formed a combination with any person to break or enter the county jail or to lynch the said Ed Johnson or to do any other act to prevent this honorable court from hearing and determining the appeal of the said Ed Johnson, or to show any contempt for this honorable court, and he denies each and every allegation made in the information against him in this cause, that by implication could be construed to mean that he had aided or consented to the lynching of the said Ed Johnson, or committed any other act or conspired, confederated, or agreed to commit any other act, or agreed for any other person to commit any act towards the lynching of the said Ed Johnson, or to break or enter the county jail of Hamilton County, Tennessee, or to prevent this honorable court from hearing the appeal of the said Ed Johnson, or to show his contempt for the orders of this honorable court, or to do any other act that would be disrespectful of this honorable court.

He says that he is not a lawyer, does not know what it takes to vest this honorable court with jurisdiction of this case, but makes the plea as to the jurisdiction upon the advice of his lawyers in this cause; but independent of his pleadings that he can prove that he had no part in the lynching of Ed Johnson, and that on the merits of his case he stands ready to show to this honorable court that he is entirely innocent of the charge made against him, and that if an opportunity is afforded him he will be pleased to present his evidence to sustain his contention as made in his answer.

He says that after Ed Johnson was lynched that the great crowd that had congregated at the bridge began to disperse and that he went to his home, where he spent the remainder of the night; that this was between ten and eleven o'clock, as he believes.

Wherefore this respondent says that he denies each and every allegation made against him in this cause.

And now having fully answered, he prays to be dismissed from the requirements of said rule to show cause why he should not be punished for a contempt of this honorable court.

The answer of defendants William Marquette, *Joe V. Williams,* attorney; James William Beeler, *Head & Ford,* attorneys; Frank Ward, *John A. Hood,* attorney, as to whom

the rule was subsequently discharged,denied all participation in the lynching of Ed Johnson and asserted an alibi and was accompanied by numerous affidavits as to defendants' whereabouts at the time.

Defendants A. J. Cartwright and R. T. Cartwright, *Shumate & Maddox* and *John H. Early*, attorneys, as to whom the rule was subsequently discharged, answered denying all knowledge and participation in the lynching of Ed Johnson, and asserting that they were elsewhere at the time.

On November 12, 1906, on motion of *Mr. Solicitor-General Hoyt*, the court assigned the cause for hearing on the preliminary questions of law, without prejudice, on Monday, December 3.

*Motion to set down for hearing on preliminary questions of law, without prejudice, etc.*

The Attorney-General calls up this information in contempt and shows the court that the answers of all the defendants are now on file, excepting the answer of Paul Pool, who has not been located and was not served with process and seems to be a fugitive.

The answers in general set up an alibi or deny connection with the mob or knowledge of its formation, and plead not guilty. Certain of the answers also rely upon the contention that this court had no jurisdiction of the Johnson case. The answer of Shipp and his deputies prays that the information be dismissed as against them, because the Circuit Court of the United States had no right or authority to entertain Johnson's petition for habeas corpus, and that consequently the order of the Circuit Court dismissing the petition was not appealable to this court.

These averments and contentions raise the question of the jurisdiction to entertain Johnson's case in the Circuit Court and in this court, and consequently the question of the jurisdiction of this court in this proceeding and other related preliminary questions of law.

The Attorney-General therefore respectfully suggests that the court set the case down for hearing under the information and answers upon these preliminary questions of law, and further suggests that the court shall, if it sees fit, define the nature and scope of these ques-

tions for discussion in the briefs and at the oral argument. Further, the Attorney-General expressly states that this application to set the case down for hearing is made without prejudice to the right of the Government to proceed thereafter as it may be entitled to do and as it may be advised, upon the merits of the case, by taking testimony under the claims of alibi and the pleas of not guilty, thereafter presenting the case for final hearing and determination upon the issues of fact thus made.

The Attorney-General also suggests that the preliminary hearing on the questions of law, for which application is now made, be set for December 3 next at the head of the call for that day, and that in any order which the court may now see fit to make in the premises it will frame the order so as to operate without prejudice to the ulterior progress of the case on the merits.

WILLIAM H. MOODY,
*Attorney-General.*
HENRY M. HOYT,
*Solicitor-General.*

Argument was heard December 4 and 5, 1906.

For the United States *The Solicitor General* (*Henry M. Hoyt*) with whom the *Attorney General* (*William H. Moody*) was on the brief.

For the defendants *Mr. Judson Harmon, Mr. Lewis Shepherd, Mr. G. W. Chamlee* and *Mr. Robert B. Cooke,* with whom *Mr. Robert Pritchard, Mr. Martin A. Fleming* and *Mr. T. P. Shepherd* were on the brief.

[For abstracts of the arguments and briefs see 203 U. S. 563–570.]

On December 24, 1906, the preliminary questions of law were decided by the court.

The headnote (prepared by the Reporter) is as follows, 203 U. S. 563:

Even if the Circuit Court of the United States has no jurisdiction to entertain the petition for *habeas corpus* of one convicted in the

state court, and this court has no jurisdiction of an appeal from the order of the Circuit Court denying the petition, this court, and this court alone, has jurisdiction to decide whether the case is properly before it, and, until its judgment declining jurisdiction is announced, it has authority to make orders to preserve existing conditions, and a willful disregard of those orders constitutes contempt.

Where the contempt consists of personal presence and overt acts those charged therewith cannot be purged by their mere disavowal of intent under oath.

In contempt proceedings the court is not a party; there is nothing that affects the judges in their own persons and their only concern is that the law should be obeyed and enforced.

After an appeal has been allowed by one of the justices of this court, and an order entered that all proceedings against appellant be stayed and his custody retained pending appeal, the acts of persons having knowledge of such order, in creating a mob and taking appellant from his place of confinement and hanging him, constitute contempt of this court, and it is immaterial whether appellant's custodian be regarded as a mere state officer or as bailee of the United States under the order.

MR. JUSTICE HOLMES delivered the following opinion, 203 U. S. 571–575.

This is an information charging a contempt of this court, and is to the following effect. On February 11, 1906, one Johnson, a colored man, was convicted of rape, upon a white woman, in a criminal court of Hamilton County, in the State of Tennessee, and was sentenced to death. On March 3 he presented a petition for a writ of *habeas corpus* to the United States Circuit Court, setting up, among other things, that all negroes had been excluded, illegally, from the grand and petit juries; that his counsel had been deterred from pleading that fact or challenging the array on that ground, and also from asking for a change of venue to secure an impartial trial, or for a continuance to allow the excitement to subside by the fear and danger of mob violence; and that a motion for a new trial and an appeal were prevented by the same fear. For these and other reasons it was alleged that he was deprived of various constitutional rights, and was about to be deprived of his life without due process of law.

On March 10, after a hearing upon evidence, the petition was denied, and it was ordered that the petitioner be remanded to the custody of the sheriff of Hamilton County, to be detained by him in his

custody for a period of ten days, in which to enable the petitioner to prosecute an appeal, and in default of the prosecution of the appeal within that time to be then further proceeded with by the state court under its sentence. On March 17 an appeal to this court was allowed by Mr. Justice Harlan. On the following Monday, March 19, a similar order was made by this court, and it was ordered further "that all proceedings against the appellant be stayed and the custody of said appellant be retained pending this appeal."

The sheriff of Hamilton County was notified by telegraph of the order, receiving the news before six o'clock on the same day. The evening papers of Chattanooga published a full account of what this court had done. And it is alleged that the sheriff and his deputies were informed, and had reason to believe, that an attempt would be made that night by a mob to murder the prisoner. Nevertheless, if the allegations be true, the sheriff early in the evening withdrew the customary guard from the jail and left only the night jailer in charge. Subsequently, it is alleged, the sheriff and the other defendants, with many others unknown, conspired to break into the jail for the purpose of lynching and murdering Johnson, with intent to show contempt for the order of this court and for the purpose of preventing it from hearing the appeal and Johnson from exercising his rights. In furtherance of this conspiracy a mob, including the defendants, except the sheriff, Shipp, and the night jailer, Gibson, broke into the jail, took Johnson out and hanged him, the sheriff and Gibson pretending to do their duty, but really sympathizing with and abetting the mob. The final acts, as well as the conspiracy, are alleged as a contempt.

The defendants have appeared and answered, and certain preliminary questions of law have been argued which it is convenient and just to have settled at the outset before any further steps are taken. The first question, naturally, is that of the jurisdiction of this court. The jurisdiction to punish for a contempt is not denied as a general abstract proposition, as, of course, it could not be with success. *Ex parte Robinson*, 19 Wall. 505, 510; *Ex parte Terry*, 128 U. S. 289, 302, 303. But it is argued that the Circuit Court had no jurisdiction in the *habeas corpus* case, unless Johnson was in custody in violation of the Constitution, Rev. Stat., § 753, and that the appellate jurisdiction of this court was dependent on the act of March 3, 1891, c. 517, § 5 (26 Stat. 827), *Ex parte Lennon*, 150 U. S. 393, and by that act did not exist unless the case involved "the construction or application of the Constitution of the United States." If the case did not involve the application of the Constitution, otherwise than by way of pretense; it is said that this court was without jurisdiction, and that its order

might be condemned with impunity. And it is urged that an inspection of the evidence before the Circuit Court, if not the face of the petition, shows that the ground alleged for the writ was only a pretense.

We regard this argument as unsound. It has been held, it is true, that orders made by a court having no jurisdiction to make them may be disregarded without liability to process for contempt. *Ex parte Sawyer*, 124 U. S. 200; *Ex parte Fisk*, 113 U. S. 713; *Ex parte Rowland*, 104 U. S. 604. But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law. It and it alone necessarily had jurisdiction to decide whether the case was properly before it. On that question, at least, it was its duty to permit argument and to take the time required for such consideration as it might need. See *Mansfield, Coldwater & Lake Michigan Ry. Co.* v. *Swan*, 111 U. S. 379, 387. Until its judgment declining jurisdiction should be announced, it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition, just as the state court was bound to refrain from further proceedings until the same time. Rev. Stat. § 766. Act of March 3, 1893, c. 226, 27 Stat. 751. The fact that the petitioner was entitled to argue his case shows what needs no proof, that the law contemplates the possibility of a decision either way, and therefore must provide for it. Of course the provision of Rev. Stat. § 766, that until final judgment on the appeal further proceedings in the state court against the prisoner shall be deemed void, applies to every case. There is no implied exception if the final judgment shall happen to be that the writ should not have issued or that the appeal should be dismissed.

It is proper that we should add that we are unable to agree with the premises upon which the conclusion just denied is based. We cannot regard the grounds upon which the petition for *habeas corpus* was presented as frivolous or a mere pretense. The murder of the petitioner has made it impossible to decide that case, and what we have said makes it unnecessary to pass upon it as a preliminary to deciding the question before us. Therefore we shall say no more than that it does not appear to us clear that the subject-matter of the petition was beyond the jurisdiction of the Circuit Court, and that, in our opinion, the facts that might have been found would have required the gravest and most anxious consideration before the petition could have been denied.

Another general question is to be answered at this time. The de-

fendants severally have denied under oath in their answer that they had anything to do with the. murder. It is urged that the sworn answers are conclusive, that if they are false the parties may be prose- cuted for perjury, but that in this proceeding they are to be tried, if they so elect, simply by their oaths. It has been suggested that the court is a party and therefore leaves the fact to be decided by the defendant. But this is a mere afterthought to explain something not understood. The court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case. On this occasion we shall not go into the history of the notion. It may be that it was an intrusion or perversion of the canon law, as is suggested by the propounding of interrogatories and the very phrase, purgation by oath (*juramentum purgatorium*). If so, it is a fragment of a system of proof which does not prevail in theory or as a whole, and the reason why it has not dis- appeared perhaps may be found in the rarity with which contempts occur. It may be that even now, if the sole question were the intent of an ambiguous act, the proposition would apply. But in this case it is a question of personal presence and overt acts. If the presence and the acts should be proved there would be little room for the dis- avowal of intent. And when the acts alleged consist in taking part in a murder it cannot be admitted that a general denial and affidavit should dispose of the case. The outward facts are matters known to many and they will be ascertained by testimony in the usual way. The question was left open in *Ex parte Savin*, 131 U. S. 267, with a visible leaning toward the conclusion to which we come, and that conclusion has been adopted by state courts in decisions entitled to respect. *Huntington* v. *McMahon*, 48 Connecticut, 174, 200, 201. *State* v. *Matthews*, 37 N. H. 450, 455. *Bates's Case*, 55 N. H. 325, 527. *Matter of Snyder*, 103 N. Y. 178, 181. *Crow* v. *State*, 24 Texas, 12, 114. *State* v. *Harper's Ferry Bridge Co.*, 16 W. Va. 864, 873. See *Wartman* v. *Wartman*, Taney, 362, 370. *Cartwright's Case*, 114 Massachusetts, 230. *Eilenbecker* v. *Plymouth County*, 134 U. S. 31. Whether or not Rev. Stat. § 725 applies to this court, it embodies the law so far as it goes. We see no reason for emasculating the power given by that section, and making it so nearly futile as it would be if it were con- strued to mean that all contemnors willing to run the slight risk of a conviction for perjury can escape.

'The question was touched, in argument, whether the acts charged constitute a contempt. We are of opinion that they do, and that their character does not depend upon a nice inquiry, whether, after the order

made by this court, the sheriff was to be regarded as bailee of the United States or still held the prisoner in the name of the State alone. Either way, the order suspended further proceedings by the State against the prisoner and required that he should be forthcoming to abide the further order of this court. It may be found that what created the mob and led to the crime was the unwillingness of its members to submit to the delay required for the trial of the appeal. From that to the intent to prevent that delay and the hearing of the appeal is a short step. If that step is taken the contempt is proved.

These preliminaries being settled the trial of the case will proceed.

Mr. Justice Moody took no part in the decision.

And on December 24, 1906, the following entry appears of record:

The opinion of the court on the preliminary questions of law herein was delivered by Mr. Justice Holmes (Mr. Justice Moody took no part) and the cause was ordered to proceed.

On January 14, 1907, there was filed the following:

*Motion to arrest defendants and require recognizances to abide the future orders of the court.*

The court having decided the preliminary questions of law herein against the defendants and ordered the case to proceed, the Attorney-General moves the court to order writs of attachment to issue that the said defendants may be brought into court and required to enter into recognizances, in such sums, respectively, as to the court shall seem adequate and proper, conditioned for their appearance whenever required and to abide the future orders of the court herein, said recognizances to be given, with good and sufficient sureties, approved by this court, unless it shall seem to the court appropriate that the said defendants, or any of them, should be permitted to appear and furnish such recognizances before the judge of the Circuit Court of the United States for the Eastern District of Tennessee, in conformity with or by analogy to the provisions of section 1014 of the Revised Statutes of the United States, in which event it is further moved that the sureties be approved by the said judge and by the justice of this court assigned to the Sixth Circuit.

Charles J. Bonaparte,
*Attorney-General.*
Henry M. Hoyt,
*Solicitor-General.*

The motion on behalf of the defendant Shipp and his deputies prayed that the witnesses named

Be ordered to be subpœnaed to 'attend at such time and place as the court may designate for hearing the testimony in this cause, and that it be ordered by the court that the costs incurred by the process of subpœna, including the.fees and mileage of said witnesses, be paid by the United States, in the same manner that similar costs and fees are paid in case of witnesses subpœnaed in behalf of the United States, or in lieu of this that the court, if it deems the same expedient, direct that the·testimony be taken in this cause by a commissioner duly appointed and to sit at Chattanooga or some other designated point in the Southern Division of the Eastern District.of Tennessee.

The motions on behalf of several of the defendants also prayed that:

Affiant is not possessed with sufficient·means and is actually unable to pay the fees of said witnesses, and he prays the court to order them to be subpœnaed, and to direct that the costs incurred by the process and the fees of the witnesses shall ·be paid in the same manner that similar costs and fees are paid in case of witnesses subpœnaed in behalf of the United States.

On January. 14, 1907, there. was filed the following:

·*Motion for the summoning of witnesses and to take testimony herein.*

In order .that the facts may be ascertained by the court as to the connection of the defendants herein with the matters which the court has held constituted contempt of its authority, the Attorney-General moves the court to take testimony herein as to the complicity of the defendants in such matters, and to examine, under oath, to be administered by the court, any witnesses ordered to be summoned in behalf of the United States or of the defendants, subpœnas therefor to be issued by the clerk of this court, with full rights of cross-examination and objection as to the admission of evidence and the competency. of witnesses to counsel for both parties; such evidence to be taken in open court unless it shall appear to the court appropriate to appoint a· commissioner or examiner to receive and record the same, and then to report such testimony, with any exceptions thereto ·made as·aforesaid, forthwith·to the court.

CHARLES J. BONAPARTE.
*Attorney-General.*
HENRY M. HOYT,
*Solicitor-General.*

And also motions on behalf of certain of the defendants for the summoning of witnesses at the expense of the Government.

On January 14, 1907, *Mr. Attorney General Bonaparte*, of counsel for the complainant, submitted to the consideration of the court a motion to arrest the defendants herein and to require them to enter into recognizances to abide the future orders of the court and also a motion as to taking testimony herein, and leave was granted to counsel for defendants to file a brief in reply thereto.

And afterwards, to wit, on January 17, 1907, defendants Shipp and others filed the following brief:

### MOTION FOR ARREST, ETC.

The only object of issuing attachments is to bring before the court the parties charged with contempt so that they may be heard, if defense they have. Rapalje on Contempts, § 100.

This course is discretionary with the court when there is any other mode of procedure open. The usual practice is by a rule to show cause. (Rapalje on Contempts, § 9, 103; *United States* v. *Anonymous*, 21 Fed. Rep. 761.)

The Government did not ask for attachments in the information, but very properly followed the usual practice, praying only for the issuance and service of "a rule to show cause, if any there be, on a day certain, why said defendants and each of them should not be punished as and for a contempt of this honorable court."

According to some authorities the personal appearance of the parties might have been required. (Rapalje on Contempts, § 109.) But the Government acquiesced in their appearance by counsel and by answers personally signed and verified.

The preliminary matters set up in those answers have been held insufficient cause, and the proceeding now stands as to each defendant on his denial, under positive oath, of the offense charged. This is surely sufficient cause as against an information verified only on information and belief until the Government produces proof. We submit that the production of that proof is now the only course open to it.

The Government has waived its right to an interlocutory attachment, if it had such right. It has waived the personal attendance of the defendants in answer to the rule. Now, as against their sworn denials, it asks, merely on its naked information, that the defendants

be arrested and committed in default of bail. There is no attempt to show any facts to justify a different course from that taken in the prayer of the information.

We submit that to grant this motion would subject the defendants to hardship and indignity which the state of the record does not justify and which would violate the presumption of innocence this court has so strongly upheld.

As to Joseph F. Shipp, sheriff, and his deputies, all this has peculiar force. They are officers of justice of the State of Tennessee. Their time is required in the service of the courts and the preservation of the peace in that State. Courtesy to the State and the tribunals they serve makes regard for the presumption of their innocence highly appropriate as well as just.

### MOTION TO TAKE TESTIMONY.

We consent, of course, to the taking of testimony. We consent, too, for the convenience of the court, that the testimony be taken by some disinterested person to be appointed by the court for that purpose.

We pray, however, that the person so appointed be directed to take the testimony at Chattanooga, where all the witnesses on both sides reside. If it should be found that any reside elsewhere we consent to taking their testimony wherever desired.

I am informed and believe, and so state to the court, that the defendants are almost without exception unable to bear the expense of traveling to Washington and remaining there during the hearing, as they would have to do or submit to a practical denial of justice. To compel them to attend a hearing away from home would be in itself a severe punishment, and trial should precede punishment. The analogies of the Constitution and the laws, too, make the place where the offense is charged to have been committed the appropriate one for the taking of the proof. As the sheriff and all his deputies are parties, their absence from their homes would also work harm to the course of business in the courts and to the preservation of the peace of their county.

Respectfully submitted.

*Mr. Judson Harmon, Clift & Cooke* and *Mr. Robert Pritchard,* attorneys for Joseph F. Shipp and others.

On January 21, 1907, the following entries appear of record, viz.:

## October Term, 1906. No. 12. Original.

On consideration of the motion to require the defendants herein to enter into recognizances for their appearances hereafter,

It is now here ordered by the court that the defendants in this cause enter into their personal recognizances in the penal sum of $1,000 each, conditioned to abide the further orders of the court before the judge of the District Court of the United States for the Eastern District of Tennessee.

On consideration of the motion as to the taking of testimony herein,

It is now here ordered by the court that a commissioner will be appointed to take the testimony of witnesses at Chattanooga, in the Eastern District of Tennessee, and counsel on both sides are given ten days in which to agree upon a fit person for such appointment and communicate the nomination to the court.

On January 25, 1907, the *Attorney General* filed the following:

*Suggestion in reply to brief for certain defendants on motion to take testimony.*

In the brief filed by certain of the defendants reasons are suggested why the testimony should be taken at Chattanooga, and the court's order directing that it shall be taken before a commissioner appears to designate Chattanooga as the place. The Attorney-General now respectfully requests the court to reconsider this designation and to designate the city of Washington, at least for the purpose of taking the testimony of witnesses for the United States, for the following reasons:

1. The defendants themselves need not attend the hearings in Washington unless, as is unlikely, they wish to be personally present, and their counsel will probably find it no serious hardship to come to Washington.

2. If the defendants are, in fact, inconvenienced and suffer some hardship through loss of time or money, or both, these are ordinary and necessary incidents of their situation. They rest under a charge which must be tried. A prima facie case has been made out, in the

sense that proofs against them are now to be offered and they are called upon to meet the charge. It may be fairly assumed that it is not wholly without their own fault that they are in this position. Defendants generally must attend the trial court at its usual place of session, either personally or by counsel. The official duties of some among them need not, and should not, change that rule in this case. The entire sheriff's force need not be withdrawn from Hamilton County merely to listen to the testimony for the United States; and it is right and customary, not harsh and arbitrary, to bring witnesses from any part of a district to the court. The court does not go to them. The entire country is the district in the present case, and the court only sits in Washington; the city of Washington, then, is the natural place for the taking of the testimony. This is none the less true because an officer of the court and not the court itself is to take the testimony, and because the defendants have the right to be present, if they are not compelled to be present.

3. It seems to us very important that the testimony should be taken under the eye and direct control of the court, to afford opportunities for immediate reference to the court by, and instructions from the court to, the commissioner in connection with unexpected incidents which may readily occur during the examination of witnesses in a case like this one, wholly without precedent.

4. Finally, it is submitted that the locality where this terrible occurrence took place, and where (as appears from the crime itself, from the record in Johnson's case, and from the oral argument herein on the preliminary questions of law) the feelings of certain portions of the community have been and are still greatly excited, is an unsuitable place for this examination, at least of the witnesses for the United States. In that locality the real facts can not be elicited in a calm and dispassionate atmosphere, free from the danger that local prejudice and a sense of personal insecurity may stifle or check the full and frank utterances of the witnesses for the prosecution; and the Attorney-General deems it his duty to advise the court that confidential information in the possession of the Department of Justice, of a character entitled to credit, indicates that witnesses for the United States may reasonably, and will in fact, entertain apprehensions of danger to themselves if they testify at Chattanooga.

On January 28, 1907, on motion of *Mr. Solicitor General Hoyt,* leave was granted counsel for the defendants to file briefs in opposition to the suggestions of the *Attorney General* as to taking testimony in this cause and on January 29, 1907,

on behalf of certain defendants there was filed the following brief opposing the motion of the *Attorney General* to require witnesses to be examined at Washington, D. C., instead of Chattanooga, Tenn.

The court is familiar with the proceedings of this cause, and this brief is presented in opposition to a motion of the Attorney-General, which motion means, if granted, that all the witnesses for the Government in these cases must be examined at Washington, D. C., instead of at Chattanooga, Tennessee.

The reason why the defendants oppose this motion is that they are all poor men, except the sheriff, and not able to pay the expenses of going from Chattanooga to Washington and there remaining, with their attorneys, during the time that the Government will be taking its proof. It cannot be said that this proof can be heard in their absence, because the charges are serious, and the court has laid down the rule that in contempt cases the defendants are entitled to meet the witnesses face to face. If this hearing is to be had at Washington and the proof taken there, it will practically amount to a denial of justice, because the defendants do not know what the Government's proof will be, nor just which of the defendants are liable to be affected by any witness. It is necessary, therefore, for all of them to be present at this hearing. The defense of the officers and the alleged lynchers is not necessarily the same, and there is no one attorney in the case in a position to represent them all; so that it becomes necessary for most all the attorneys who have been actively engaged in these cases to attend these hearings. We say that there is no reason in the world why the witnesses for the Government should not tell the facts about this case at Chattanooga, Tennessee, just as freely as at any other place. And if after the hearing has commenced at Chattanooga any witness is intimidated, the court has power to change the place of the hearing and also to punish the offending party, if such a case were possible. Public opinion is in a mood now to hear freely, frankly, and unreservedly all the facts of this case at Chattanooga without intimidation towards anybody.

To take these witnesses away from Chattanooga and deprive these defendants of the right to meet them face to face, as must necessarily result, is a great hardship upon them, and particularly so if they are innocent, as they claim to be, and especially on account of their poverty.

Many of these defendants have heretofore filed their affidavits showing that they are unable to pay the expenses of their own wit-

nesses to the city of Washington, and they now appeal to your honors not to have this hearing at Washington, because it imposes hardships upon them that they cannot bear, and is as to some of them a denial of justice.

We most respectfully and earnestly insist that there is no sound reason or foundation for the argument that the witnesses for the Government will testify to facts in Washington, D. C., that they are unwilling to tell at the home of the witnesses and when surrounded by their own families and friends. Besides, the law is sufficient to protect the witnesses, and there ought not to be a precedent established by this court that its commissioner or examiner was unable to get the truth out of witnesses because of the sentiment at the place of the hearing being reported as favorable to the accused when the law presumes the accused innocent of the charges against him.

We most earnestly submit that this honorable court should not make an order in these cases that will prevent the defendants from having the fullest opportunity to show their innocence in this case, and for that reason the motion of the Attorney-General should be overruled.

*Geo. W. Chamlee, Lewis Shepherd*, attorneys.

On January 31, 1907, the following nomination to the court of a commissioner to take the testimony was filed.

The Attorney-General has the honor to report that counsel of record for the defendants unite with him in the nomination to the court of James D. Maher, Esq., of the District of Columbia, to take the testimony of the witnesses in this cause.

And on the same day *Mr. Solicitor General Hoyt*, of counsel for the complainant, submitted the nomination to the consideration of the court.

On February 2, 1907, there was filed the following answer of Joseph F. Shipp, sheriff, and his deputies, to suggestion of *Attorney General* as to taking testimony.

The Attorney-General asks this court to reconsider its order designating Chattanooga as the place of taking testimony in this case, and requests that the city of Washington be designated, at least for the purpose of taking testimony of witnesses for the United States.

And now come the defendants, Joseph F. Shipp, Frank Jones, Matthew Galloway, C. A. Baker, T. V. Taylor, Fred Frawley, George Brown, Jeremiah Gibson, Marion Perkins, and Joseph Clark, defendants, being the said sheriff and his deputies, and respectfully show to the court that the granting of said request would work great hardship upon them and might result in actual injustice.

These defendants were, at the time of the happening of the matters and things complained of in the information of the Attorney-General, officers of Hamilton County, Tennessee, sworn to uphold the law, and occupying positions which the public welfare required should be filled by persons who respected the law, and who would obey it.

The information not only charges them with failure to uphold the law, but with having become parties to a conspiracy to dethrone the law and substitute in its place mob violence, the antithesis of law.

A conviction of these defendants under the charges of the information involves not only the crime and infamy of perjury, but the guilt of conspiracy to murder.

These defendants have heretofore, prior to the filing of the information in this case, enjoyed the respect and confidence of their fellow-citizens, and it is of the utmost importance to them that their good names be not destroyed unless they are convicted after a full, fair, and impartial trial.

It is not the purpose of the United States to inflict wrong upon any of its citizens, however humble. These defendants verily believe that the granting of the request of the Attorney-General would do them grievous wrong. Every one of these defendants is entitled to be confronted by the witnesses against him. It has been shown by affidavits that many of them are not able to attend the taking of the testimony at Washington. It would be impossible for all of the counsel for all of the defendants to be present all the time, and a false witness might escape proper cross-examination and might leave an impression of truth. The presence of the defendants, when witnesses for the prosecution are being examined, is an important right, one that should not be denied. The defendants are not only entitled to the aid of counsel, but counsel are entitled to the assistance of the defendants.

It is true that these defendants rest under a charge which must be tried, but they submit that they are entitled to a trial which will give them the right to be present, so that they may have the privilege accorded to the meanest criminal of being faced by their accusers. This right will be practically denied should the testimony be taken in Washington.

The Attorney-General suggests that it may be fairly assumed that

it is not wholly without their own fault that these defendants are placed in the position which they would be placed were his request granted, but these defendants are unable to reconcile this assumption with the presumption of innocence which the law accords to them.

Answering the further suggestion that Washington is the proper place for the hearing of testimony because the court sits at Washington for the whole United States, these defendants say that the court has already decided that it will not hear oral testimony and has allowed counsel for both parties to nominate a commissioner to take the testimony.

The suggestion contained in paragraph three (3) is equally without merit, because it is impossible to conceive of this tribunal allowing separate hearings on every "unexpected incident which may readily occur during the examination of witnesses," it being the duty of the commissioner to act upon exceptions to testimony, as well as "unexpected incidents."

Finally, these defendants solemnly deny the averments contained in the fourth paragraph of the suggestion of the Attorney-General. They deny that there is any foundation in fact for the serious and unusual charge, confessedly based upon secret information to which neither the defendants nor this honorable court have access, that Chattanooga is, for any reason, an unsuitable place to take the testimony of witnesses. They deny that the real facts cannot be elicited there in "a calm and dispassionate atmosphere." They deny that the testimony would be colored or suppressed by local prejudice or any sense of personal insecurity, or that full and frank utterance of the truth by witnesses for or against these defendants would be "stifled or checked." Whatever may be the character of the "confidential information" to which the Attorney-General refers, these defendants deny that any witness for the United States could reasonably or would, in fact, entertain any apprehension whatever of danger if he testified at Chattanooga.

Defendants respectfully submit that the charges contained in said paragraph 4 that the feelings of the community are excited, that the truth would be suppressed from prejudice or from a sense of personal insecurity, or from any other cause, are based upon information of an unreliable character or upon a mistaken conception of the facts.

The "confidential" character of the information referred to by the Attorney-General precludes an investigation of its reliability by these defendants; but in opposition thereto these defendants present herewith the affidavits of D. L. Snodgrass, J. W. Bachman, C. A. Lyerly, Wm. L. Frierson, J. T. Moseley, T. S. Wilcox, G. G. Fletcher and

M. M. Allison, whose positions in the community indicate their character and standing.   Wherefore these defendants pray, etc.

On February 4, 1907, the following order appointing commissioner to take testimony was entered:

This cause coming on to be heard in respect of the appointment of a special commissioner to take testimony herein, and the parties, duly appearing by their counsel, having agreed upon a fit person for such appointment and communicated their nomination to the .court:

It is ordered that Mr. James D. Maher, a resident of the District of Columbia, be, and he is hereby, appointed a commission to take and return the testimony in this proceeding, with the powers of a master in chancery, as provided in the rules of this court; but said commissioner shall not make any findings of fact or state any conclusions of law.

It is further ordered that the taking of the testimony shall be commenced at the city of Chattanooga, in the Eastern District of Tennessee, as soon as possible, at such place as the commissioner shall designate, reasonable notice thereof to be given counsel on both sides, and .be proceeded in with all convenient speed; and the commissioner is hereby authorized also to take testimony elsewhere if that shall be agreed on by counsel or appear to be necessary, with leave to him or to either of the parties to apply to the court for such orders in that regard as they may be advised.

Said commissioner shall promptly report to the court the testimony taken by him, without findings of fact or conclusion of law, and shall receive such compensation as may hereafter be determined, and his actual expenses, an itemized statement of which shall accompany his report.

On February 6, 1907, the oath of James D. Maher as commissioner herein was filed in the words and figures following, viz.:

I, James D. Maher, commissioner appointed by the Supreme Court of the United States to take and return the testimony in the cause of The United States of America, complainant, *vs.* John F. Shipp et al. (No. 12, Original, October term, 1906), do solemnly swear that I will faithfully and impartially discharge and perform all the duties de-

volved on me as such commissioner, according to the best of my ability and understanding. So help me God.

JAMES D. MAHER.

Subscribed and sworn to before me this 5th day of February, 1906.

[SEAL.] JAMES H. McKENNEY,
*Clerk of the Supreme Court of the United States.*

The Commissioner proceeded to Chattanooga and executed the commission.

The following stipulations were entered into as to the taking of testimony and appear in the record:

In this cause it is stipulated and agreed that after the testimony is reduced to typewriting it shall be submitted to counsel for the several parties and promptly examined, and unless counsel find material errors in the same the testimony may be signed by the commissioner, with the same force and effect as if signed by each witness. In the event material errors are found, they shall be called to the attention of the commissioner and the usual course shall be taken in reference thereto.

In this cause, to save the time and expense of taking proof as to the matters hereinafter referred to, it is stipulated and agreed as follows:

That on the 11th day of February, 1906, one Ed Johnson, a citizen of the United States and a resident and citizen of the State of Tennessee, and a colored person of African descent, was convicted of the crime of rape in the criminal court of Hamilton County, held at the city of Chattanooga, in the State of Tennessee, and said court thereupon sentenced the said Ed Johnson to suffer the penalty of death.

That on the 3d day of March, 1906, and before the date set for the execution of the said Ed Johnson, a petition for a writ of *habeas corpus*, signed by the said Ed Johnson as petitioner, was duly presented to the United States Circuit Court for the Northern Division of the Eastern District of Tennessee in which it was alleged, among other things, that upon the trial of the said Ed Johnson in the criminal court of Hamilton County, in the State of Tennessee, for the crime of rape, for which he had been convicted, said petitioner had been denied a trial by a fair and impartial jury, and had been denied the aid of counsel in violation of the fifth and sixth amendments to the Federal Constitution, and that said petitioner was also denied rights secured to him under the fourteenth amendment to the Federal Constitution;

that thereafter, to wit, on the 10th day of March, 1906, the application of the said Ed Johnson for a writ of *habeas corpus* came on for hearing before the said United States Court for the Eastern District of Tennessee upon the petition, return, answer, and replication, and upon the testimony of witnesses given orally in open court, and after argument of counsel the said Circuit Court ordered that said petition be dismissed and that the writ of *habeas corpus* prayed for in said petition be denied, and further ordered that said petitioner be remanded to the custody of the sheriff of said Hamilton County, in the State of Tennessee, to be detained by said sheriff in his custody for the period of ten days in which to enable said petitioner to prosecute an appeal from said order should he be so advised and should an appeal lie from said order, and in default of the prosecution of an appeal within said time to be then further proceeded with by the court of the State of Tennessee under its sentence.

. That thereafter, on the 17th day of March, 1906, an application was duly presented by the said Ed Johnson to the Hon. John M. Harlan, an associate justice of the Supreme Court of the United States, assigned to the sixth circuit, asking that an appeal be allowed to the Supreme Court of the United States from the judgment rendered in the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee on March 10, 1906, denying his, the said Ed Johnson's, application for a writ of *habeas corpus*, as aforesaid, which said appeal was on the same day allowed by Mr. Justice Harlan.

That on the 19th day of March, 1906, a motion was duly made in the Supreme Court of the United States by counsel for and representing the said Ed Johnson for an order allowing an appeal to the Supreme Court of the United States from the judgment of the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee, rendered on the 10th day of March, 1906, denying his, the said Ed Johnson's, application for a writ of *habeas corpus*, which motion was thereupon granted by the Supreme Court of the United States and an order duly made and entered by the Chief Justice in the words and figures following, to wit:

ED JOHNSON, APPELLANT, ⎫
        *vs.*        ⎬
THE STATE OF TENNESSEE. ⎭

On motion of *Mr. E. M. Hewlett*, of counsel for the appellant, it is ordered by the court that an appeal from the Circuit Court of the United States for the Eastern District of Tennessee be, and the same is hereby, allowed, and that all proceedings against the appellant be

stayed, and the custody of the said appellant be retained pending
this appeal.

Per MR. CHIEF JUSTICE·FULLER.

That there was also published and circulated in said city of Chat-
tanooga in the evening paper on the said 19th day of March, 1906,
before six o'clock p. m., an account of the action of the Supreme Court
of the United States in allowing an appeal and granting a stay of
further proceedings on the part of the state courts against the said
Ed Johnson until the determination of said appeal before the Supreme
Court of the United States.

That during all the times herein mentioned, and on and subsequent
to March 19th, 1906, the above-named defendant, J. F. Shipp, was
the duly elected, qualified, and acting sheriff of Hamilton County, in
the State of Tennessee, and as such sheriff had and exercised full
charge and control of the county jail, located in the city of Chatta-
nooga, in said county, and was the legal custodian under the laws of
Tennessee of all persons duly committed in said county under the
laws of said State to confinement and imprisonment within said jail;
and that the defendants, Frank Jones, Matthew Galloway, C. A.
Baker, Fred Frauley, George Brown, Jeremiah Gibson, Marion Perkins,
and each of them, were, during all the times herein mentioned, and on
and subsequent to March 19, 1906, the duly appointed, qualified, and
acting deputy sheriffs of said county and State under the said J. F.
Shipp.

It is further agreed that this stipulation may be offered before the
commissioner by either the complainant or defendant as evidence of
any part or all of the matters hereinbefore stipulated. Provided,
however, that no admission is made as to the competency or relevancy
of any of the facts above stated, this stipulation being merely in-
tended as proof of the facts above stipulated with the same force and
effect as if duly proven by the testimony of witnesses and to be sub-
ject in all respects to the same exceptions as the testimony of wit-
nesses would be; all parties expressly reserving the right to except
to any portion of this stipulation when introduced in evidence upon
any ground relating to the competency, relevancy, or admissibility
of the subject-matter to which this stipulation relates.

The following took place before the Commissioner:

*Mr. Assistant Attorney General Sanford:* I thought that had
been submitted to all of the counsel. It was so intended.
That, I understand, is agreed to by all of the counsel and we
will have it drawn up in proper form.

In regard to the matter of the telegram sent by the clerk of the Supreme Court of the United States, it was agreed by counsel to whom the matter has been mentioned that the Commissioner's personal statement may be taken as evidence in the matter of when that telegram was sent and its contents.

The COMMISSIONER: This telegram was sent by myself, for the clerk, on the day it is dated, March 19th, in the neighborhood of one o'clock in the afternoon. I delivered it personally at the telegraph office in the corridor of the House of Representatives in the Capitol at Washington, and pre-paid it; and this copy was made under my direction before I left Washington.

The copy was put in the record.

On October 14, 1907, the United States moved the court to file the reports of James D. Maher, esquire, special commissioner herein, as to the taking of testimony and as to his expenses.

And on October 14, 1907, on motion of *Mr. Assistant Attorney General Sanford,* of counsel for the complainant, it was ordered that the testimony taken herein be opened, published, and filed; also on same day and on motion of *Mr. Assistant Attorney General Sanford,* of counsel for the complainant, leave was granted to file the reports of the Commissioner as to the taking of testimony and as to his expenses in connection therewith, and also stipulations of counsel as to facts, as to the taking of the testimony, and as to the misnomer of certain defendants.

On October 14, 1907, a motion was made for leave to file stipulations as to misnomer of certain defendants, as to taking of testimony, and as to certain agreed facts.

And on October 14, 1907, the reports of the Commissioner as to taking testimony and as to expenses were filed as follows:

To the honorable the Supreme Court of the United States:

The undersigned commissioner appointed by an order entered in this cause on the 4th day of February, 1907, to take and return such evidence as the parties to said cause should produce, respectfully reports

to the court that pursuant to the said order he opened the commission conferred on him in the United States court room in the city of Chattanooga, State of Tennessee, on Tuesday, February 12, 1907, at 10 o'clock a. m., and, the counsel for the respective parties being present, proceeded to execute the said commission on that day and on the 13th, 14th, and 15th days of the same month, when, on the suggestion of the counsel for the complainant, an adjournment was taken. Pursuant to notice given by the undersigned to counsel for the respective parties, the taking of testimony in the cause was resumed at the same place on Monday, June 10, 1907, and continued on the 11th, 12th, 13th, 14th, 15th, 17th, 18th, 19th, 20th, 21st, 24th, 25th, 26th, 27th, 28th, and 29th days of the same month, on which last-named day, the parties not offering any more testimony, the commission was closed.

The said commission was executed by receiving the testimony of the several witnesses named in the testimony, who were sworn to testify to the truth, the whole truth, and nothing but the truth before giving their evidence, and the testimony so given by them was taken down by a stenographer in the presence of the undersigned, and is herewith submitted, together with the exhibits offered in evidence.

Said testimony and exhibits, contained in 20 typewritten volumes containing 2,283 pages, have been deposited with the clerk of this honorable court.

Respectfully submitted.

JAMES D. MAHER,
*Commissioner.*

To the Honorable the Supreme Court of the United States:

Pursuant to the order of this honorable court entered on the 4th day of February, 1907, appointing the undersigned as commissioner to take and return the testimony in the above-entitled cause and directing a statement of actual expenses incurred in the taking of said testimony to be submitted, I beg leave to state that it became necessary to travel to the city of Chattanooga, Tennessee, on two separate occasions—in February and June, 1907—and the expenses of the commissioner were as follows:

In February:

| | | |
|---|---|---|
| Railroad fares.................................... | $48 15. | |
| Cabs and baggage............................... | 1 60 | |
| Room at hotel................................... | 15 00 | |
| Meals........................................... | 16 15 | |
| Telegrams....................................... | 1 46 | |
| | $82 36 | $82 36 |

| Amount carried forward | | $82 36 |
|---|---|---|
| In June: | | |
| Railroad fares. ..... | $43 00 | |
| Cabs and baggage. | 2 50 | |
| Hotel bill | 83 75 | |
| Meals on trains and at club. | 5 75 | |
| Telegrams. | 1 69 | |
| | $136 69 | $136 69 |
| Making a total of. | | $219 05 |

Respectfully submitted.

JAMES D. MAHER,
*Commissioner.*

On November 4, 1907, the following order was made:

It is now here ordered by the court that Mr. James D. Maher, the commissioner appointed by this court to take and return the testimony in this cause, be, and he is hereby, allowed the sum of $800.00 in full for his compensation and expenses, and that said sum be paid by the complainant herein.

And on April 22, 1908, the following motion for leave to take additional testimony was made:

The Solicitor-General appearing for and on behalf of the United States, moves the court to reopen the hearing of testimony in this case and to reappoint Mr. James D. Maher as commissioner for the purpose of taking and returning additional testimony to the court in this behalf.

In support of this motion the Solicitor-General shows and represents to the court that under the original order of reference to the said commissioner the Government and the defendants took their testimony in the city of Chattanooga, Tenn., in the year 1907, and closed their case in June of that year; that said commissioner subsequently made his report as to the taking of testimony, which was opened, published, and filed pursuant to an order of court; that while, since the taking of testimony was closed as aforesaid, the Government has made no further effort to find additional testimony, the Department of Justice recently and unexpectedly was informed that two persons who were not examined on the former hearing were eye-

witnesses of part of the incidents connected with the lynching of the prisoner, Ed Johnson, which is involved in this information, and could identify two of the defendants herein as connected therewith; that the department thereupon caused this matter to be inquired into through the office of the United States attorney for the Eastern District of Tennessee, and was advised by him that these two persons will so testify and will identify two of the defendants in question.

The Solicitor-General further represents and shows to the court that he is advised that these two parties did not previously make known their knowledge of these facts in reference to this matter on account of fear, and that there was no means by which the Government could have been previously advised as to the information which they possessed or could have obtained their testimony on the former hearing.

The Solicitor-General further represents and shows to the court that this application for leave to take additional testimony is not made for purposes of delay, but solely that justice may be done and all material evidence brought to the attention of the court.

He therefore prays that the taking of testimony may be reopened, and that the said James D. Maher may be reappointed as commissioner, with the same powers as under his original appointment, and may be directed to proceed at an early and convenient date to the city of Chattanooga, Tenn., there to take the testimony of the two witnesses in question, together with any rebuttal testimony which any of the defendants may desire to offer in that behalf, or further testimony which may be rendered necessary in behalf of the Government by reason of such rebuttal evidence, if any, and to report such additional testimony to the court.

Respectfully submitted.

HENRY M. HOYT,
            *Solicitor-General.*

The defendants submitted the following answer to motion for leave to take additional testimony:

The defendants Joseph F. Shipp, Frank Jones, Matthew Galloway, C. A. Baker, Fred Frawley, and Marion Perkins, appearing by their attorneys, Judson Harmon, Robert Pritchard, James J. Lynch, M. H. Clift, and Robert B. Cooke; the defendants T. B. Taylor and George Brown, appearing by their attorney, T. W. Stanfield; the defendant Jeremiah Gibson, appearing by his attorneys, Clift & Cooke; the defendant Joseph Clark, appearing by his attorneys, Spears & Lynch; the defendants Claude Powell, Nick Nolen, Chas. J. Powell, Bart

Justice, John Jones, Henry Padgett, William May, John Varnell, and Alfred Handman, appearing by their attorneys, Lewis Shepherd and Shepherd & Fleming; the defendants "Sheenie" Warner and Luther Williams, appearing by their attorney, G. W. Chamlee; the defendant William Beeler, appearing by his attorneys, Ford & Chamlee and G. W. Chamlee; the defendants W. J. Cartwright and R. F. Cartwright, appearing by their attorneys, S. P. Maddox and John H. Early; the defendant Frank Ward, appearing by his attorneys, G. W. Chamlee and John A. Hood; and the defendant William Marquette, appearing by his attorney, Joe V. Williams, answering the petition of the Solicitor-General for leave to take additional testimony in this case say:

1. It is true that much proof has been taken in this case both by the Government and the defendants, and the defendants closed their proof in June, 1907; the report of the commissioner has been made and the testimony opened, published, and filed. It is likewise probably true that the Government made no effort to find additional evidence after the closing of the testimony.

2. These defendants take it for granted that the statement that the Department of Justice has received the information set out in the motion is true. But they call the attention of the honorable court to the vague and meagre statements of the motion upon this subject. The names of the two persons who are supposed to have been eye-witnesses of "part of the incidents connected with the lynching of the prisoner, Ed Johnson," are not given. The nature of the "part of the incidents" they saw is not stated. The names of the "two defendants" whom it is supposed these witnesses "could identify as connected therewith" are not given.

3. While these defendants submit that they are entitled to be furnished with the names of the two witnesses, they do not insist upon this because the motion suggests that "these two parties did not previously make known their knowledge of these facts in reference to this matter on account of fear." Defendants aver that nothing whatever has occurred, so far as their knowledge or information extends to support the suggestion that any concealment of facts has been induced by fear of any sort.

4. But there are many defendants to the information in this case and many of them have separate defenses and the defendants are not all represented by the same counsel. The defense has been onerous and expensive. It is inferrible from the statements of the motion that only two defendants will be interested in the additional testimony sought to be taken. To save the expense of the attendance of all the defendants and the attorneys for all of them, these defendants

respectfully submit that they are entitled to be furnished with the names of the two defendants who will be affected by the proposed additional testimony. After the testimony of the two witnesses in question shall have been taken, the defendants affected thereby should have reasonable time within which to collect and adduce evidence in rebuttal.

Defendants therefore offer no resistance to the motion further than to insist that before it is allowed they should be furnished with the names of the two defendants whom it is proposed to identify by the witnesses, and that such additional time be allowed as may be necessary for collecting and adducing rebuttal evidence.

On May 4, 1908, *Mr. Solicitor General Hoyt* submitted a motion for leave to take additional testimony herein, and for the reappointment of James D. Maher as Commissioner to take and return said testimony, and the following order was made on May 18, 1908:

On consideration of the motion for leave to take additional testimony herein, and that James D. Maher be appointed commissioner to take the same, it is now here ordered by the court that said motion be, and the same is hereby, granted, due notice of the names of the particular defendants affected by the proposed evidence to be given and leave being granted to give evidence in rebuttal.

On October 13, 1908, *Mr. Solicitor General Hoyt* presented the reports of the commissioner appointed to take additional testimony herein, and submitted an oral motion as to the matter of his compensation, and on his motion it was ordered that the additional testimony taken herein be opened, published and filed.

On the same day, October 13, 1908, the following reports of the Commissioner were filed:

*To the Honorable the Supreme Court of the United States:*

The undersigned commissioner appointed by an order entered in this cause on the 18th day of May, 1908, to take and return such additional evidence as the parties to said cause should produce, respectfully reports to the court that pursuant to the said order he proceeded to the city of Chattanooga, Tennessee, on the 28th day of June, 1908, and opened the commission conferred on him in the

United States court room in said city on the first day of July, 1908, at 10 o'clock a. m., and, the counsel for the respective parties being present, proceeded to execute the said commission on that day and the day following, on which last-named day the parties not offering any more testimony the commission was closed. The said commission was executed by receiving the testimony of the several witnesses named in the said testimony, who were sworn to testify to the truth, the whole truth, and nothing but the truth before giving their evidence, and the testimony so given by them was taken down by a stenographer in the presence of the undersigned and is herewith submitted.

Said testimony, comprising 175 typewritten pages, has been deposited with the clerk of this honorable court.

Respectfully submitted.

JAMES D. MAHER,
*Commissioner.*

*To the Honorable the Supreme Court of the United States:*

Pursuant to the order of this honorable court entered on the 18th day of May, 1908, appointing the undersigned as commissioner to take and return additional testimony in the above entitled cause, I beg leave to state that I proceeded to the city of Chattanooga, Tennessee, on June 28, 1908, and returned to the city of Washington on July 3, 1908, and that my expenses were as follows . . . $64.35

Respectfully submitted, JAMES D. MAHER, *Commissioner.*

On October 14, 1908, the following order was made:

It is now here ordered by the court that Mr. James D. Maher, the commissioner appointed by order of this court, entered herein on May 18th, 1908, to take and return additional testimony in this cause, be, and he is hereby, allowed the sum of $200.00 in full for his compensation and expenses, and that said sum be paid by the complainant herein.

On October 13, 1908, a motion was made by the *Attorney-General* to dismiss as to certain defendants.

The Attorney-General, on behalf of the United States, moves that the information herein be dismissed as to the defendants Paul Pool, T. B. Taylor, William Beeler, John Jones, Marion Perkins, C. A. Baker, Claude Powell, Charles J. Powell, A. J. Cartwright, R. F. Cartwright, John Varnell, Joseph Clark, Fred Frauley, Paul or "Sheenie" Warner, Alfred Hammond, William Marquette, and George Brown, and that they be discharged from their respective recognizances

entered into pursuant to an order of this honorable court made herein on the 21st day of January, 1907, without prejudice, however, to the right of the United States to prosecute this proceeding as to each and all of the other defendants herein with the same force and effect as if the proceeding against the above-named defendants were not dismissed.

Testimony has been taken and the cases of all parties closed. All of the testimony has been reported by the commissioner, printed, published, and filed pursuant to an order of the court.

Efforts to serve Paul Pool with process in this proceeding have been unsuccessful. He left Chattanooga soon after the lynching and has never since been located, according to our information.

The proof fails to disclose any evidence implicating defendants T. B. Taylor, William Beeler, John Jones, Marion Perkins, C. A. Baker, Claude Powell, Charles J. Powell, A. J. Cartwright, R. F. Cartwright, or John Varnell in the acts complained of in the information.

The defendant John Jones is not the John Jones which the Government witnesses testify to having seen in the lynching party. The witnesses stated positively that he was not the same party.

On October 13, 1908, on motion of *Mr. Solicitor General Hoyt*, of counsel for the complainant, it was ordered by the court that the information herein be, and the same is hereby, dismissed as to the defendants, Paul Pool, T. B. Taylor, William Beeler, John Jones, Marion Perkins, C. A. Baker, Claude Powell, Charles J. Powell, A. J. Cartwright, R. F. Cartwright, John Varnell, Joseph Clark, Fred Frauley, Paul or "Sheenie" Warner, Alfred Hammond, William Marquette and George Brown.

On March 2 and March 3, 1909, the case was duly argued and submitted to the Supreme Court of the United States and on May 25, 1909, that honorable court rendered its decision; the opinion of the court was delivered by Mr. Chief Justice Fuller,[1] and on that day the following order was duly entered.

---

[1] In which Mr. Justice Harlan, Mr. Justice Brewer, Mr. Justice Holmes and Mr. Justice Day concurred. See p. 426, *ante*, for dissenting opinion of Mr. Justice Peckham, in which Mr. Justice White and Mr. Justice McKenna concurred; Mr. Justice Moody did not sit.

## UNITED STATES OF AMERICA, ss:

The President of the United States, To the Marshal of the Supreme Court of the United States,

Greeting:

(SEAL)

Whereas it has been made to appear to the Supreme Court of the United States that Joseph F. Shipp, Jeremiah Gibson, Luther Williams, Nick Nolan, Henry Padgett and William Mayse have been adjudged by the said court, now in session at the city of Washington, in the District of Columbia, to be in contempt of said court.

We, therefore, command you that you attach the said Joseph F. Shipp, Jeremiah Gibson, Luther Williams, Nick Nolan, Henry Padgett and William Mayse, so as to have their bodies before the said Supreme Court of the United States at the city of Washington, in the District of Columbia, on the first day of June, 1909, at 12 o'clock noon of that day, to answer the said court of the said contempt, by them lately committed against it, as it is said, and further, to do and receive what our said court shall in that behalf consider.

Hereof fail not, and have you then and there this writ.

Witness the Honorable Melville W. Fuller, Chief Justice of the United States, this 25th day of May, A. D. 1909.

JAMES H. McKENNEY,
*Clerk of the Supreme Court of the United States.*

And thereafter and on June 1, 1909, the marshal produced the defendants named before this honorable court and a motion having been made for leave to file a petition for rehearing the following order was made:

The marshal of this court made return to the attachment heretofore issued herein by producing the bodies of the defendants, Joseph F. Shipp, Jeremiah Gibson, Luther Williams, Nick Nolan, Henry Padgett and William Mayse, who appeared in open court in their proper persons, and thereupon the Solicitor General moved the court for sentence upon the said defendants above named, and counsel for the said defendants moved the court for leave to file a petition for rehearing—

Whereupon, upon consideration, It is now here ordered by the court that leave be, and the same is hereby, granted to file motions for leave to file petitions for rehearing herein within thirty days.

It is further ordered that the said above named defendants be re-

manded to the custody of the United States marshal for the Eastern District of Tennessee, he having been deputized by the marshal of this court to serve the attachment herein, to be released on entering into recognizances in the penal sum of one thousand dollars each, conditioned to abide the further order of the court, before the judge of the District Court of the United States for the Eastern District of Tennessee.

And thereafter the following proceedings took place, as appears by the following certificate:

Before me, the District Judge of the United States for the Eastern District of Tenneesse, personally came, in open court, in the District Court of the United States for the Southern Division of the Eastern District of Tennessee, the marshal of said court, and produced the bodies of the defendants Joseph F. Shipp, Jeremiah Gibson, Luther Williams, Nick Nolan, Henry Padgett and William Mayse, who appeared in open court in their proper persons; and there was at the same time exhibited to me a copy of an order entered in this cause by the Supreme Court of the United States on June 1, 1909, directing that said defendants be released from custody on entering into recognizances before me in the penal sum of one thousand dollars each, conditioned to abide the further order of the Supreme Court of the United States;

Whereupon each of said defendants, Joseph F. Shipp, Jeremiah Gibson, Luther Williams, Nick Nolan, Henry Padgett and William Mayse, did, in open court, enter into his recognizance before me as required by said order of the Supreme Court, and did acknowledge himself to be indebted to the United States of America in the penal sum of one thousand dollars, such obligation to be void upon condition that he should abide the further order of said Supreme Court in the premises; otherwise to remain in full force and effect; and each of said defendants was thereupon released by the marshal from custody.

In witness whereof, I have hereunto set my hand this fourth day of June, 1909.

EDWARD T. SANFORD,
*Judge of the United States District Court
for the Eastern District of Tennessee.*

On June 28, 1909, a petition for rehearing was filed on behalf of defendant Williams.

On June 30, 1909, a petition for rehearing was filed on behalf of defendants Shipp and Gibson.

On July 1, motions of defendants Padgett, Mayse and Nolan for leave to file petitions for rehearing were filed.